IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS, a non-profit corporation,<br><br>      Petitioner/Plaintiff,<br><br>vs.<br><br>UNITED STATES FOREST SERVICE, an agency of the United States; UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the United States; JOHN R. ERICKSON, acting in his official capacity as Forest supervisor, Ashley National Forest; JUAN PALMA, acting in his official capacity as State Director of the Bureau of Land Management, Utah State Office; MIKE STIEWIG, acting in his official capacity as Field Office Manager of the Vernal Field Office of the Bureau of Land Management,<br><br>      Respondent/Defendants,<br><br>and<br><br>BERRY PETROLEUM COMPANY, LLC, a Delaware limited liability company,<br><br>      Intervenor-Respondent. | **DRAFT RE: PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Case No. 2:14-cv-00349-DN<br><br>Judge David Nuffer |

Pursuant to Federal Rules of Civil Procedure 65(a), Petitioner and Plaintiff WildEarth

Guardians (the "Petitioner" or "WildEarth") moved[1] for a preliminary injunction against

Respondents and Defendants United States Forest Service ("Forest Service"); Bureau of Land

Management ("BLM"); John R. Erickson, in his official capacity as Forest Supervisor, Ashley

---

[1] Petitioner's Motion and Memorandum in Support of a Preliminary Injunction ("Motion"), docket no. 72, filed February 26, 2015.

National Forest ("Forest"); Juan Palma, in his official capacity as State Director of the BLM, Utah State Office; Mike Stiewig, in his official capacity as Field Office Manager of the Vernal Field Office BLM (collectively "Respondents"; as well as against Intervenor Berry Petroleum Company, LLC (the "Operator," or "Berry Petroleum"). Petitioner's Motion is based on allegations that Respondents and Intervenor have violated the National Environmental Policy Act[2] ("NEPA"), the Mineral Leasing Act of 1920,[3] as amended by the Federal Onshore Oil and gas leasing Reform Act of 1987 ("Reform Act"), the National Forest Management Act[4] ("NFMA"), the Clean Air Act[5] ("CAA"), the Clean Water Act[6] ("CWA"), and the Roadless Area Conservation Rule[7] ("Roadless Rule").

On January 25, 2016, Petitioner filed a status report, stating that the requisite irreparable harm element for their preliminary injunction request no longer exists, and they are willing to withdraw their preliminary injunction motion.[8] On January 26, 2016, a hearing was held for the pending preliminary injunction motion ("January 26, 2016 Motion Hearing").[9] At the January 26, 2016 Motion Hearing, Petitioner withdrew its motion for preliminary injunction, but the parties agreed that argument on the likelihood of success element would be beneficial moving forward. Argument proceeded that day.

---

[2] 42 U.S.C. §§ 4321, et seq.

[3] 30 U.S.C. §§ 181, et seq.

[4] 16 U.S.C. §§ 1600, et seq.

[5] 42 U.S.C. §§ 7401, et seq.

[6] 33 U.S.C.A. §§ 1251, et seq.

[7] 36 C.F.R. § 294.10, et seq.

[8] Status Report, docket no. 105, filed January 25, 2016.

[9] *See* Minute Order, docket no. 106; January 26, 2016 Motion Hearing Transcript ("Transcript"), docket no. 108, filed February 4, 2016.

As discussed at the hearing,[10] this draft is provided for the benefit of the parties as they proceed to draft their briefs on the merits. However, this is not a final decision on the merits and does not bind the parties or the court.  The parties' memoranda, supporting documentation, and oral argument of counsel have carefully been reviewed.[11]

# Table of Contents

A.	Background ................................................................................................................. 4
B.	Standards of Review .................................................................................................. 7
	1.	Motions for Preliminary Injunction .................................................................. 7
	2.	Actions Under the APA ....................................................................................... 8
C.	Irreparable Harm ........................................................................................................ 9
D.	Balance of Harm ....................................................................................................... 10
E.	Public Interest ........................................................................................................... 12
F.	Likelihood of Success on the Merits ...................................................................... 15
	1.	The Forest Service adequately assessed the effects of the Project on Sage-Grouse
		and did not fail to minimize impacts to the Anthro Mountain Population............ 15
		a.	Respondents have not violated NEPA by failing to address the NTT
			Report........................................................................................................... 15
		b.	The Forest Service was not required to consider an alternative based on
			the NTT Report ............................................................................................ 20
		c.	The Forest Service has not failed to update its Sage-Grouse Mitigation.. 26
		d.	The Forest Service has not violated NFMA by failing to consider the NTT
			Report........................................................................................................... 29
	2.	The Forest Service did not Err by Failing to Design, Consider and Implement an
		Alternative that Would Comply with the Roadless Rule and NEPA .................... 34
		a.	The Forest Service did not violated NEPA by not considering a
			development alternative that would protect roadlessness.......................... 34
		b.	The Forest Service did not violated the Roadless Rule requirement by not
			protecting roadless areas ............................................................................ 39
	3.	The Forest Service did not Fail To Assess Impacts To Air Quality And To Comply
		With Air Quality Standards.................................................................................... 48
		a.	The Forest Service did not rely on an unsupported and unexplained 24-
			Hour $PM_{2.5}$ background concentration ...................................................... 48
		b.	The Forest Service did not violate NEPA by failing to address the
			secondary formation of $PM_{2.5}$ in its Near Field Analysis......................... 53

---

[10] Id. at 86:9-13.

[11] Citations to the Administrative Record will be AR[bate number]. Citation to the Administrative Record for the Supplemental Information Report will be SIR[bate number].

c.      The Forest Service did not violate the law by failing to take a hard look and approving a project that resulted in violations of the NAAQS and PSD increments ............................................................................................... 56

d.      The analysis of truck trips is supported by the record and does not falls short of NEPA ...................................................................................................... 64

4.      *The Forest Service Did Not Fail To Take A Hard Look At The Impact Of The Project On Water Quality And Did Not Violate NEPA By Failing To Ensure That Water Quality Standards Will Be Met* .................................................................. 71

## A.  BACKGROUND

Congress, in 1987, passed the Reform Act.[12] Among other things, the Reform Act required the Forest Service to analyze lands that are available for oil and gas leasing.[13] In accordance with the Reform Act mandate, the Forest Service developed the 1997 Western Uinta Basin Oil and Gas Leasing Environmental Impact Statement ("EIS") and Record of Decision ("1997 ROD").[14] The 1997 ROD opened portions of the South Unit of the Ashley National Forest for oil and gas leasing and development.[15] Portions of the area opened up for oil and gas leasing (the "Project Area") are designated by the Utah Division of Wildlife Resources ("DWR") as high value winter and summer habitats for many different species of wildlife, including the Anthro Mountain greater sage-grouse population.[16]

The 1997 ROD imposed a list of stipulations on future leases to minimize impacts from any development. The 1997 ROD did, however, permit controlled use of areas where sensitive wildlife species are present (such as the sage grouse), so long as operations do not adversely affect the viability of the species.[17] Leases for the South Unit were issued the following year,

---

[12] Amended Petition for Review of Agency Action and Complaint for Injunctive and Declaratory Relief at ¶ 87 ("Amended Petition"), docket no. 3, filed May 14, 2014.

[13] *Id.*

[14] *Id.*

[15] *Id.* ¶ 88.

[16] AR61555, AR61452-64.

[17] AR1397.

1998, to Berry Petroleum.[18] In 2007, Berry Petroleum submitted a Master Development Plan ("MDP") to the Forest Service proposing to explore and develop the oil and gas reserves within the leased area by drilling up to 400 new oil and gas wells on up to 400 well pads.[19] Over the next five years, the Forest Service analyzed Berry Petroleum's MDP proposal, as well as three other alternatives. First, the Forest Service, in 2007, published a notice of intent to prepare an EIS, and solicited public comments at the scoping stage.[20]  In 2010, the Forest Service issued a multi-volume draft EIS, and offered a 60-day public comment period.[21] Finally, in February 2012, the Forest Service issued its Final Environmental Impact Statement ("FEIS"). Based on the FEIS, the Forest Service issued a Record of Decision ("2012 ROD").[22] The 2012 ROD rejected Barry Petroleum's MDP, and selected one of the various alternatives considered in its FEIS.[23] The alternative chosen (the "Project") incorporates, among other things, various mitigation measures and other requirements to minimize or mitigate surface and environmental impacts associated with Barry Petroleum's development of its lease rights.[24] The chosen alternative also requires phased implementation of the Project to ensure "meaningful opportunities to consider new knowledge that may . . . develop[] over the life of the project."[25] The Project is divided into three phases (Phases A, B, and C), and development is deferred in more sensitive habitat areas to Phase C, and much of the inventoried roadless areas to Phases B and C.[26]

---

[18] Amended Petition, ¶ 90. Linn Energy, LLC acquired Berry Petroleum in December 2013. Any reference to Berry Petroleum, except in the context of pre-December 2013 activities, is intended to include references to Linn Energy.

[19] AR61286; AR61683-706.

[20] AR1925-26; AR1554-56.

[21] AR60147-928 (Draft EIS).

[22] Amended Petition ¶ 92.

[23] *Id.* ¶ 91–92.

[24] *Id.* ¶¶ 245, 378, 410; AR62054-56, 72-82.

[25] AR62057.

[26] *Id.*

The 2012 ROD provides the operating framework for oil and gas development but does not authorize any ground-disturbing activities. Before ground-disturbing activities can be undertaken, Berry Petroleum must submit to the BLM an application for permit to drill ("APD") for each well.[27] And after Berry Petroleum submits an APD to the BLM, then the Forest Service must approve a proposed Surface Use Plans of Operation ("SUPOs") before BLM may approve the APD.[28] Within seven days, the BLM must post the APD proposal for a 30-day viewing period in the Vernal Utah field office, as required by regulation.[29] BLM conducts a review of the APD, but reserves action on the APD until BLM receives a memo from the Forest Service approving the associated SUPO. During the same time, the Forest Service conducts its own review of the proposed SUPO. The Forest Service's review might entail a site visit and additional alterations to the APD request (such as moving the location of the proposed well pad). If the Forest Service determines that the SUPO is consistent with the 2012 ROD, it will approve the SUPO. Before the BLM approves the final APD, it will include any conditions of approval imposed by the Forest Service, and may further impose additional mitigation measures.[30]

After the 2012 ROD was approved, Petitioner filed an administrative appeal.[31] The Forest Service affirmed the 2012 ROD and denied Petitioner's appeal.[32] On May 14, 2014, Petitioner filed an Amended Petition for review of the 2012 ROD and any wells approved under that 2012 ROD.[33] As of May 14, 2014, the BLM had approved 79 APDs with the Project area.[34]

---

[27]Amended Petition, ¶ 95.

[28] *Id.*

[29] 43 C.F.R. § 3162.3-1(g).

[30] Declaration of Stephanie Howard ¶ 5, docket no. 82-1, filed April 17, 2015.

[31] AR63381-420.

[32] AR64285-86.

[33] *See* Amended Petition.

Petitioner contends that the Forest Service and the BLM have failed to keep their promise of considering new information and research before approving SUPOs and APDs.[35] According to Petitioner, with the approval of the last 79 APDs, "the Forest Service and BLM have not considered new data on air quality, recent conservation measures or the latest sage-grouse research, . . . have not provide public notice of their [APD] decisions and have not provided opportunities for their sister agencies and the public to present new information, research, planning and policy."[36] Petitioner believes that the Forest Service and the BLM have relied on inadequate environmental analysis and mitigation measures found in the 2012 ROD and the 2012 FEIS to approve SUPOs and APDs.[37]

Petitioner's motion for preliminary injunction seeks to enjoin any further implementation of the Project, and any further authorizations made pursuant to or in reliance on the 2012 ROD and the 2012 FEIS.[38]

## B.  STANDARDS OF REVIEW

### 1.  *Motions for Preliminary Injunction*

"A preliminary injunction is an 'extraordinary and drastic remedy.'"[39] "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."[40] A preliminary injunction is "never

---

[34] *See* Declaration Certifying Administrative Record, docket no. 42-2 at 3 (listing the APDs approved as of date of the Amended Petition).

[35] Motion at 1.

[36] *Id.* at 2.

[37] *Id.*

[38] *Id.* at 3.

[39] M*unaf v. Geren,* 553 U.S. 674, 689, (2008).

[40] *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24, (2008) (internal quotation marks omitted).

awarded as of right,"[41] but only when "the movant's right to relief is 'clear and unequivocal.'"[42] In order to obtain a preliminary injunction a plaintiff must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[43]

> If the plaintiff can establish that the latter three requirements tip strongly in his favor, the test is modified, and the plaintiff may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation.[44]

> "'[C]ourts of equity should pay particular regard for the public consequences in

employing the extraordinary remedy of injunction,'"[45] and a plaintiff's failure to prove any one

of the four preliminary injunction factors renders its request for injunctive relief unwarranted.[46]

### 2. *Actions Under the APA*

Where a statute, such as NEPA or NFMA, does not provide for a private right of action,

the APA[47] provides for judicial review for challenges to final agency actions. Under the APA,

the petitioner has the burden of establishing that the agency's action is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law."[48] An agency's decision is arbitrary

and capricious if the agency: 1) "entirely failed to consider an important aspect of the problem";

2) "offered an explanation for its decision that runs counter to the evidence before the agency, or

---

[41] *Id.*

[42] H*eideman v. S. Salt Lake City,* 348 F.3d 1182, 1188 (10th Cir.2003).

[43] W*inter,* 555 U.S. at 20.

[44] *Greater Yellowstone Coal. v. Flowers,* 321 F.3d 1250, 1255-56 (10th Cir. 2003) (quoting D*avis v. Mineta,* 302 F.3d 1104, 1111 (10th Cir. 2002)).

[45] *Winter* 55 U.S. at 24.

[46] *See id.* at 23–24; *accord* S*ierra Club, Inc. v. Bostick,* 539 Fed.Appx. 885, 888–89 (10th Cir. 2013) (unpublished) ("A party seeking a preliminary injunction must prove that *all four* of the equitable factors weigh in its favor.").

[47] 5 U.S.C. §701 *et seq.*

[48] 5 U.S.C. § 706(2)(a).

is so implausible that it could not be ascribed to a difference in view or the product of agency expertise"; 3) "failed to base its decision on consideration of the relevant factors"; or 4) made "a clear error of judgment."[49]

## C.  IRREPARABLE HARM

In order to receive a preliminary injunction, the moving party must establish that it will suffer irreparable harm without the preliminary injunction—that is, that failing to grant the injunction will cause plaintiff to suffer an injury that is not 'merely serious or substantial' but 'certain, great, actual and not theoretical.'[50]

"[T]he party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm."[51] "Mere threatened, speculative harm, without more, does not amount to irreparable injury for purposes of justifying preliminary injunctive relief . . . ."[52]

By its nature, "[a]n environmental injury usually is of an enduring or permanent nature, seldom remedied by money damages and generally considered irreparable."[53] However, "[t]he Supreme Court has recognized that financial harm can be weighed against environmental harm— and in certain instances outweigh it."[54]

---

[49] *Utah Envtl. Cong. v. Troyer,* 479 F.3d 1269, 1280 (10th Cir. 2007) (quotations omitted).

[50] *Vill. of Logan v. U.S. Dep't of Interior,* 577 F. App'x 760, 766 (10th Cir. 2014) (quoting H*eideman,* 348 F.3d at 1189 (internal quotation marks omitted)).

[51] *Heideman v. S. Salt Lake City,* 348 F.3d 1182, 1189 (10th Cir.2003)(quoting *Wisconsin Gas Co. v. FERC,*758 F.2d 669, 674 (D.C. Cir. 1985)).

[52] *Chem. Weapons Working Grp. Inc. v. U.S. Dep't of Army,* 935 F. Supp. 1206, 1215 (D. Utah 1996) *aff'd sub nom. Chem. Weapons Working Grp., Inc. (CWWG) v. U.S. Dep't of the Army,* 111 F.3d 1485 (10th Cir. 1997).

[53] *Catron Cnty. Bd. of Comm'rs, New Mexico v. U.S. Fish & Wildlife Serv.,* 75 F.3d 1429, 1440 (10th Cir. 1996).

[54] *Sierra Club, Inc. v. Bostick,* 539 F. App'x 885, 892 (10th Cir. 2013) (citing A*moco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545 (1987) ("And on the other side of the balance of harms was the fact that the oil company petitioners had committed approximately $70 million to exploration . . . which they would have lost without chance of recovery had exploration been enjoined.").

The irreparable harm element is not currently met. This was conceded by Petitioner in its January 25, 2016 status report. In the status report, Petitioner states that it "believes that it is likely that this case could be litigated on the merits before the alleged irreparable and imminent harm would occur."[55]

## D.  BALANCE OF HARM

Petitioner states that the balance of harms weighs in its favor because its "staff and members—and the area of the Ashley National Forest threatened by the 400-well Project that they cherish—face significant environmental harm and [Respondents] and [Operator], at worst, face some speculative financial harm . . . ."[56] Regarding Respondents, Petitioner states that "[i]t is unclear that . . . [they] will suffer any harm from a brief delay to ensure that they comply with laws designed to protect the environment, public lands, and public participation."[57] As for any harm that the Operator, Berry Petroleum, might suffer, Petitioner provides several reasons why the harm is inadequate to shift the balance:

> First, Operator's harm is purely economic and its reasonable profit expectations are necessarily constrained by the regulatory scheme under which it leased this area of the Forest. Second, Operator was on notice that each of its 17 leases only vested it "with the right to conduct oil and gas operations somewhere on the lease," so that its development opportunities could be limited. Third, Operator also knew that the agencies had adopted a "phased implementation" strategy to allow consideration of new data, research, planning and policy applicable to the most sensitive portions of the Project Area, and that, as a result of this new information, its oil and gas activities could be further restricted. Fourth, the Operator has had ample access to its leases and, according to the Forest Service, particularly to those portions of the leases with a "high probability of economic quantities" of oil and gas.[58]

---

[55] Status Report at 2.

[56] Motion at 54.

[57] Id.

[58] Id.

Respondents, in their opposition to the balance of harm element defer to Berry Petroleum to present evidence of its specific harms from an injunction.[59] Berry Petroleum contends that "[i]nstead of demonstrating the extent and likelihood of harm, WildEarth chooses to argue that it is entitled to a presumption that the balance of harms tips in its favor."[60] According to Berry Petroleum, Petitioner must present sufficient facts and evidence to demonstrate that the balance of harms tips in its favor.[61] However, Petitioner "cannot demonstrate that the harm it alleges is probable if an injunction is not issued."[62] Berry Petroleum contends that in contrast to Petitioner's lack of harm, "an injunction will have real and immediate impacts on Berry Petroleum's business operations."[63]

> A broad injunction with an indefinite timeframe will undoubtedly affect Berry Petroleum's ability to plan activities for the 2015 season, but will also impact the ability to plan and prepare for subsequent years. Well development has a long lead time and technical considerations, requiring early planning activities, such as cultural resource surveys, that could be swept up in and barred by an injunction. Thus, any injunction is likely to have effects lasting several years.[64]

> In conclusion, Berry Petroleum states that "[g]iven that WildEarth fails to demonstrate a threat of imminent irreparable harm and the inevitable impact of an injunction to Berry Petroleum's operation, the balance of harms weighs against an injunction."[65]

Petitioner in reply merely reargues the same position it already set forth in his Motion for Preliminary Injunction.[66]

---

[59] Federal Respondents' Opposition to Petitioner's Motion for a Preliminary Injunction at 81("Respondents' Opposition"), docket no. 82, filed April 17, 2015.

[60] Opposition to WildEarth Guardians' Motion for preliminary Injunction at 50 ("Berry Petroleum's Opposition"), docket no. 83, filed April 17, 2015.

[61] *Id.* at 50.

[62] *Id.*

[63] *Id.* at 51 (citing Declaration of Scott Canonico ¶ 8, docket no. 83-1, filed April 17, 2015).

[64] *Id.*

[65] *Id.*

Even if the injuries alleged by Petitioner are likely to qualify as irreparable harm, the Petitioner's injuries must still be balanced against the harms asserted by Berry Petroleum. In the end, Petitioner must show that "the balance of equities tips in [its] favor."[67]

Berry Petroleum argues that "an injunction will have real and immediate impacts on [its] business operations[,]" and "any injunction is likely to have effects lasting several years."[68] Although Berry Petroleum has indicated that it will suffer some form of financial harm, it has failed to demonstrate or quantify the magnitude of the harm it will suffer if it is enjoined from further operations.

In the end, the balance of harm t seems to turn on the merits of the case. If the Respondents and Intervenor have failed to comply with NEPA, then the environmental harm faced by the Petitioner will likely outweigh the Intervenor's financial harm. If NEPA's procedural requirements have been met, then Respondents have, in the FEIS, taken into consideration the harm Petitioner alleges, and the balancing of harms would weigh in favor of Respondents and Intervenor.

Presently, however, the Petitioner has not established that the balancing of the harms tips strongly in its favor.

## E.  PUBLIC INTEREST

Petitioner argues that "[t]he public interest also tips decidedly in favor of a preliminary injunction."[69] Petitioner asserts that there is a strong public interest in protecting the environment and public lands and in ensuring that federal agencies comply with laws designed to ensure well-

---

[66] Petitioner's Reply Memorandum in Further Support of a Preliminary Injunction at 19 ("Reply"), docket no. 89, filed May 30, 2015.

[67] *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[68] Berry Petroleum's Opposition at 51.

[69] Motion at 55.

informed decisions, protect the environment, public lands, and public participation.[70] Petitioner

further argues that "such public interests are not outweighed by need for energy, particularly here

where the requested delay is temporary, the Operator has already constructed more than 100

wells . . . , and the agencies have declared . . . they should pause to consider and apply new data"

before proceeding onto the second phase of the project.[71]

     Respondents state that they have fully complied with their NEPA obligations, thus the

public's interest in ensuring that federal agencies comply with laws has not been undermined.[72]

Respondents, citing the Mineral Leasing Act, Multiple Use-Sustained Yield Act, and NFMA,

further argue that there is a public interest in allowing multiple uses of federal lands.[73] "And

Congress has expressly provided for development of federal oil and gas resources in the Mineral

Leasing Act . . . ."[74]  Additionally, Berry Petroleum argues that both the "NEPA analysis and

ROD . . . demonstrate that the Forest Service appropriately balanced competing public interests

by approving the Project subject to extensive mitigation to minimize its effects on sage-grouse,

roadless areas, air quality, water quality, and other resources."[75]

     In reply, Petitioner simply states that the intent of the statutes cited by Respondents

"leans just as heavily in the direction of protecting the environment as developing it."[76]

     "A movant also has the burden of demonstrating that the injunction, if issued, is not

adverse to the public interest."[77] Petitioner claims that there is a strong public interest in

---

[70] *Id.*

[71] *Id.*

[72] Respondents' Opposition at 80.

[73] *Id.* (citing *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545–46 (1987)). NFMA and the Multiple Use-Sustained Yield Act allow for multiple uses of federal lands. *See* 16 U.S.C. § 1604(e)(1) (forest plans should "provide for multiple use and sustained yield of the products and services"); 16 U.S.C. §§ 528-531.

[74] Respondents' Opposition at 80 (citing 30 U.S.C. §§ 181–196).

[75] Berry Petroleum's Opposition at 52.

[76] Reply at 20.

protecting the environment and in ensuring that federal agencies comply with laws designed to ensure well-informed decisions, protect the environment, public lands, and public participation.[78]

Although protection of the environment and compliance with laws are factors which must be considered in balancing the public interest, they are not the only factors. Another factor is our nation's goal of energy independence, which is recognized within many statutes enacted by Congress. As pointed out by Respondents and Berry Petroleum, the Mineral Policy Act of 1970 directs the Forest Service to "foster and encourage private enterprise in . . . the development of economically sound and stable . . . industries, [and in] the orderly and economic development of domestic mineral resources . . . to help assure satisfaction of industrial, security and environmental needs."[79] Another relevant statute is the FLPMA which requires the Forest Service and BLM to manage the public lands for "multiple use and sustained yield" "in a manner which recognizes the Nation's need for domestic sources of minerals, food, timer, and fiber."[80] And, as another example, the Multiple Use-Sustained Yield Act allows for multiple uses of federal lands.[81]

In viewing the factors related to the public interest, Petitioner has failed to demonstrate that issuance of the injunction is adverse to the public interest.

---

[77] *Heideman*, 348 F.3d at 1191.

[78] Motion at 55.

[79] 30 U.S.C. § 21a.

[80] 43 U.S.C. § 1701(a)(7), (12).

[81] 16 U.S.C. § 1604(e)(1) (stating that the forest plans should "provide for multiple use and sustained yield of the product and services").

## F.  LIKELIHOOD OF SUCCESS ON THE MERITS

### 1.  *The Forest Service adequately assessed the effects of the Project on Sage-Grouse and did not fail to minimize impacts to the Anthro Mountain Population*

In August 2011, a team of state and federal scientists, including resource specialists from the BLM and the US Fish and Wildlife Services ("FWS"), convened the Sage-Grouse National Technical Team ("NTT").[82] Four months later, in December 2011, the NTT issued the NTT Report, which comprised of a set of recommendations for the BLM's region-wide land management planning process for the sage grouse.[83]

Petitioner raises several arguments in relation to the NTT Report. Petitioner argues that Respondents have: (a) violated NEPA by failing to address the NTT Report; (b) failed to consider an alternative action that adequately protects the sage-grouse; (c) failed to revise or supplement its NEPA review to address the NTT Report; and (d) failed to adequately explain why the NTT Report was disregarded, thus violating NFMA. Each argument is addressed in turn.

### a.  **Respondents have not violated NEPA by failing to address the NTT Report**

Petitioner argues that "the NTT Report discredits the key measures the Forest Service adopted to avoid or minimize the adverse impacts of the 400-well Project on sage-grouse and to demonstrate compliance with its regulatory duties."[84] Petitioner compares and contrasts the mitigation measures adopted by the Forest Service in the ROD with those proposed by the NTT Report.[85] Petitioner concludes from the inconsistencies found that the Forest Service has violated NEPA by failing to take a "'hard look at the proffered evidence' in the NTT Report."[86]

---

[82] AR65519; AR65589; AR63493.

[83] AR65516-89.

[84] Motion at 40.

[85] *Id.* at 42–44.

[86] *Id.* at 57.

Respondents contend that the Forest Service satisfied the hard look "requirement by thoroughly analyzing and disclosing potential impacts to the sage grouse, and discussing the ten mitigation measures incorporated into the Project to protect the sage grouse."[87] Specifically the Forest Service "analyzed the latest science recommended by FWS as well as the vast majority of studies underlying the NTT Report."[88] Respondents point out that the Forest Service solicited the FWS—the resource agency tasked with determining the protections needed for sage grouse—to assist in designing the appropriate mitigation measures.[89] The FWS "conducted an extensive review of the scientific literature and determined that Wyoming's Core Area Approach had 'excellent potential for meaningful conservation of sage grouse.'"[90] The FWS "recommended that the [Forest Service] consider the studies underlying Wyoming's Core Area Approach in designing mitigation measures for the Project."[91] Respondents state that the Forest Service followed the FWS's recommendation, undertook such an analysis and adopted Wyoming's approach in the FEIS.[92] According to Respondents, "[t]he NTT Report did not break any new scientific ground . . . ."[93] Instead, the NTT Report considered the same studies that were already considered by the FWS as part of its 2010 Listing Petition.[94] Furthermore, the Forest Service "also thoroughly considered many of the studies underlying the NTT Report in the FEIS."[95] Respondents conclude that the fact the Forest Service "did not address every single study

---

[87] Respondents' Opposition at 41–42.

[88] *Id.* at 43.

[89] *Id.*

[90] *Id.* (quoting 2010 Listing Petition, 75 Fed. Reg. at 13,974-75).

[91] *Id*.

[92] AR61457-58.

[93] Respondents' Opposition at 44.

[94] *Id.* (citing AR63493).

[95] Respondents' Opposition at 44.

identified in the NTT Report does not demonstrate that the analysis in the FEIS failed to consider the 'latest science and best biological judgment,' let alone was arbitrary or capricious."[96]

In reply, Petitioner reiterates that "the Forest Service neglected its obligations under NEPA and the duty to minimize or eliminate project impacts on the Anthro Mountain sage-grouse population[,]" by not taking a hard look at the NTT report or addressing "the discrepancies between [the Forest Service's] proposed mitigation and the NTT analysis deeming those mitigation measures ineffective."[97] Petitioner contends that "analyzing a subset of the studies cited by the NTT Report is not the same as taking a hard look at the conservation measures the [NTT] report proposes specific to the exact situation confronting the Forest Service[.]"[98] Petitioner further states that "the Forest Service did not analyze the vast majority or many of the sage-grouse studies the NTT Team cited."[99] Petitioner proceeds to provide some examples of studies cited by the NTT Report that Petitioner argues were not analyzed by the ROD.

NEPA "require[s] agencies to consider environmentally significant aspects of a proposed action."[100] "NEPA does not, however, require agencies to elevate environmental concerns over other appropriate considerations; it requires only that the agency take a 'hard look' at the environmental consequences before taking a major action."[101] Also, "NEPA dictates the process by which federal agencies must examine environmental impacts, but does not impose substantive

---

[96] *Id.* at 45.

[97] Reply at 41 (citing AR64262-64).

[98] *Id.* (citing R65537-39).

[99] Reply at 42.

[100] *Utahns for Better Transp. v. U.S. Dep't of Transp.,* 305 F.3d 1152, 1162 (10th Cir.2002).

[101] *Citizen's Committee to Save Canyons v. Krueger,* 513 F.3d 1169, 1178 (10th Cir. 2008) (citation and internal quotation marks omitted).

limits on agency conduct."[102] NEPA merely guards against "uninformed—rather than unwise—agency action."[103] Agencies must "take a 'hard look' at the environmental consequences of proposed actions utilizing public comment and the best available scientific information."[104] The "hard look" standard ensures the "agency did a careful job at fact gathering and otherwise supporting its position."[105] In order for the Forest Service to have violated the "hard look" requirement, there must be a finding that the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[106] "Deficiencies in an EIS that are mere 'flyspecks' and do not defeat NEPA's goals of informed decision-making and informed public comment will not lead to reversal."[107]

The crux of Petitioner's claim is that the Forest Service violated NEPA's "hard look" requirement because it did not consider the NTT Report and the specific recommendations therein. Petitioner's position that the Forest Service should have considered the NTT Report is based on its interpretation that the Report contains the "latest science and best biological judgment."[108] Petitioner argues that consideration of the NTT Report is particularly important because of several discrepancies between the NTT Report's recommendations and the key measures that the Forest Service adopted to avoid or minimize the adverse impacts of the 400-

---

[102] *Utah Environmental Congress v. Russell,* 518 F.3d 817, 821 (10th Cir. 2008).

[103] *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 351 (1989).

[104] *Colorado Envtl. Coal. v. Dombeck,* 185 F.3d 1162, 1171 (10th Cir. 1999); *see also Robertson,* 490 U.S. at 350.

[105] *New Mexico ex rel. Richardson v. Bureau of Land Managements,* 565 F.3d 683, 704 (10th Cir. 2009) (quotations omitted).

[106] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, (1983).

[107] *New Mexico ex rel. Richardson,* 565 F.3d at 704.

[108] Motion at 56.

well Project on sage-grouse.[109] Petitioner, however, does not identify any particular scientific study contained or cited in the Report that would have been essential to the Forest Service's reasoned decision-making on the environmental consequences of the Project. Instead, Petitioner's claim boils down to a disagreement over the scientific conclusions and recommendations between the NTT Report and the mitigation measures adopted by the Forest Service.

While it might be true that discrepancies exist between the recommendations in the NTT Report and the core mitigation measures set for by the Forest Service, such discrepancies do not invalidate the Forest Service's actions or decisions. Instead, Petitioner must show that the Forest Service's analysis was unsupported by evidence in the administrative record, and inadequate for the Forest Service to meet its goal of informed and reasoned decision-making.[110] This, Petitioner has failed to do. The record reflects that the Forest Service collected and utilized the best available data—including a majority of studies underlying the NTT Report—to analyze the potential impacts to the Antho Mountain Sage Grouse population, and identified and incorporated mitigation measures to protect the sage grouse. The Forest Service also solicited the FWS—the resource agency tasked with determining the protections needed for sage grouse—to assist in designing the appropriate mitigation measures. The FWS "conducted an extensive review of the scientific literature and determined that Wyoming's Core Area Approach had 'excellent potential for meaningful conservation of sage grouse.'"[111] The FWS "recommended that [the Forest Service] consider the studies underlying Wyoming's Core Area Approach in

---

[109] *Id.*

[110] *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1036 (10th Cir. 2001).

[111] Respondents' Opposition at 43 (quoting 2010 Listing Petition, 75 Fed. Reg. at 13974–75).

designing mitigation measures for the Project."[112] Respondents state that the Forest Service

followed the FWS's recommendation, undertook such an analysis and adopted Wyoming's

approach in the FEIS.[113]

Accordingly, the Forest Service took the requisite hard look at the environmental

consequences of the Project by considering the latest science and relevant available information

in designing its core mitigation measures. Based on the record, the Forest Service met its goal of

informed decision-making regarding the appropriate mitigation measures for the Project, and

Petitioner is unlikely to demonstrate that the Forest Service's decision to not consider the NTT

Report was arbitrary or capricious, or contrary to the requirements of NEPA.

### b. The Forest Service was not required to consider an alternative based on the NTT Report

Petitioner argues that the Forest Plan, the Sensitive Species Policy and the Forest Service

require "[e]valuation of an alternative that incorporates 'the latest science and best biological

judgment . . . .'"[114] And they also "mandate that alternatives be devised to address each of the

key issues implicated by the proposed project."[115] Petitioner says that the Forest Service failed to

consider such an alternative action based on the NTT Report.

Respondents contend that Petitioner's argument fails both procedurally and on the merits.

They argue that it fails procedurally because Petitioner, although submitting extensive comments

on the FEIS, never requested the Forest Service to consider any additional alternatives, let alone

an alternative based on the NTT Report. Thus, Petitioner waived this argument for appeal.

Respondents argue that the argument also fails on the merits because the Forest Service is "not

---

[112] *Id.*

[113] *Id.* (citing AR61457–58).

[114] Motion at 57.

[115] *Id.* (citing 36 C.F.R. § 220.5(e)).

'required' to consider the NTT Report as an additional, stand-alone alternative."[116] Respondents point out that "[t]he FEIS includes detailed consideration of four alternatives, including the preferred alternative with all of the mitigation measures necessary to minimize impacts to the sage grouse."[117] According to Respondents, the NTT Report was not considered because: (1) it "simply offers guidance intended for the ongoing range-wide planning process for the sage grouse[;]"[118] (2) the "NTT Report concedes its recommendations may be unreasonable for existing leases[;]"[119] (3) "to the extent the NTT Report's recommendations could even apply to this Project, they are largely consistent with the measures included in the preferred alternative[;]"[120] and (4) the Forest Service "developed the preferred alternative to ensure compliance with the Forest Plan's standard for the sage grouse[.]"[121] Respondents conclude that the Forest Service "considered a reasonable range of alternatives [as required by NEPA], and Petitioner has failed to demonstrate it is likely to prove this analysis was arbitrary and capricious."[122]

Petitioner replies that Respondents' procedural argument has no merit, because Petitioner "submitted extensive comments on the *draft*, not final EIS in April 2010, . . . 18 months before the NTT Report was released. Therefore, it would have been impossible for Guardians to suggest an NTT mitigation-based alternative in 2010, when the organization submitted its DEIS comments."[123] Citing *Silverton Snowmobile Club v. U.S. Forest Service,*[124] Petitioner also states

---

[116] Respondents' Opposition at 48.

[117] *Id.* (citing AR61475-80).

[118] *Id.*

[119] *Id.*

[120] *Id.*

[121] *Id.* at 49.

[122] *Id.*; *see* 40 C.F.R. § 1502.14(a).

[123] Reply at 45 (citing AR61052–87).

that it did not waive its NTT mitigation alternative claim because Petitioner "raised the NTT conservation measures alternative in its appeal, complaint and briefs."[125] Finally, Petitioner argues that it "is free to raise its alternative claim in the context of the 78 site-specific authorizations because NEPA exhaustion requirements are excused 'when plaintiff was not properly notified of the administrative remedies available to it and/or was not provided a meaningful opportunity to participate in the administrative process.'"[126] Petitioner states that it has established that "the Forest Service has not provided Guardians, or other members of the public, a meaningful opportunity to participate in any of the SUPO approvals and has failed to provide any notice of available administrative remedies."[127]

Regarding the merits of the claim, Petitioner contends that the Forest Service is incorrect in its belief that it did not need to consider a management alternative based on the NTT Report conservation measures simply because "the NTT Report concedes its recommendations may be unreasonable for existing leases[.]"[128] Petitioner argues that the NTT Report's "conservation measures were deemed 'necessary' by the NTT Team 'to promote sustainable sage-grouse populations, focus on the threats' to these populations, such as 'existing leases' and apply the measures, for example, to 'approval of an [APD].'"[129] Petitioner concludes that the Report's "conservation measures specifically accommodate existing rights and, where appropriate, can be applied as 'reasonable' measures to mitigate existing rights."[130]

---

[124] 433 F.3d 772, 783 (10th Cir. 2006).

[125] Reply at 45–46 (citing 7 U.S.C. § 6912 ("a person shall exhaust all administrative appeal procedures" before bringing an action); AR63410-11).

[126] Reply at 46 (quoting *Dine Citizens v. Klein*, 676 F.Supp.2d 1198, 1209 (D. Colo. 2009)).

[127] *Id.*

[128] *Id.* at 43–44 (quoting Respondents' Opposition at 48).

[129] *Id.* at 44 (citing AR65520; AR65537).

[130] Reply at 45.

"Under NEPA, an EIS prepared by a federal agency must include a discussion of 'alternatives to the proposed action.'"[131] "The agency must '[r]igorously explore and objectively evaluate all reasonable alternatives' for the proposed action in response to a 'specif[ied] underlying purpose and need.'"[132]  "The range of reasonable alternatives 'is not infinite.'"[133] "Once an agency appropriately defines the objectives of an action, 'NEPA does not require agencies to analyze 'the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective.'"[134] When reviewing "an EIS under the APA to determine whether an agency acted arbitrarily or capriciously by not considering certain alternatives, a 'rule of reason and practicality' informs the analysis."[135]  The question that needs to be asked is "whether the agency selected and considered a range of alternatives 'sufficient to permit a reasoned choice among the options.'"[136] "The 'rule of reason' considers both the range of alternatives and the extent the agency discusses the selected alternatives."[137]

The 2012 FEIS identifies four alternatives the agencies considered: (1) the no-action alternative; (2) the original proposed action (249 acres of total disturbance); (3) alternative 3 (255 acres of total disturbance); and (4) alternative 4, the preferred alternative (246 acres of total

---

[131] *Wyoming v. USDA,* 661 F.3d 1209, 1243 (10th Cir. 2011) (quoting 42 U.S.C. § 4332(2)(C)(iii)).

[132] *Biodiversity Conservation Alliance v. Jiron*, 762 F.3d 1036, 1083 (10th Cir. 2014) (quoting 40 C.F.R. §§ 1502.13, 1502.14(a)).

[133] *Id.* (quoting *Utahns for Better Transp. v. U.S. Dep't of Transp.,* 305 F.3d 1152, 1166 (10th Cir.2002)); *see also Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 551 (1978) ("Common sense also teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man.").

[134] *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1030 (10th Cir. 2002) (quoting *All Indian Pueblo Council v. United States, 975 F.2d 1437, 1444 (10th Cir.1992)).

[135] *Biodiversity Conservation Alliance,* 762 F.3d at1083 (quoting *Airport Neighbors Alliance, Inc. v. United States,* 90 F.3d 426, 432 (10th Cir.1996)).

[136] *Id.* (quoting *Wyoming, 661 F.3d at 1243* (quotations omitted)).

[137] *Id.* (quoting *Utahns for Better Transp.,* 305 F.3d at 1166); *see also Envtl. Def. Fund, Inc. v. Andrus,* 619 F.2d 1368, 1375 (10th Cir.1980) ("The discussion of environmental effects of all alternatives need not be exhaustive, but it must be such that sufficient information is contained therein to permit a 'rule of reason' designation of alternatives beyond the primary proposal.").

disturbance). "The three action alternatives vary in terms of timing of development, number and size of well pads, number of wells per pad, miles of new road construction road needed to access the well pads and acres of surface disturbance."[138]

"Alternative 3 is a phased development alternative, which would allow drilling to extract oil and gas resources while adding additional protection measures for key resources in the Project Area. This alternative would require a phased approach to drilling wherein one option would be to drill leaseholds from east to west and north to south within the Project Area."[139] "Alternative 4 is the Preferred Alternative. It would require the use of directional drilling, with multiple wells per well pad, to minimize the number of well pads and access roads required. Surface disturbance would be limited to an average of four well pads per section, for a maximum of 162 well pads across the Project Area. All wells would be required to be drilled from those 162 well pads, with each well pad up to 3 acres in size to safely accommodate multiple wells."[140]

"Applying the rule of reason to the question of whether this was a sufficiently broad/diverse range of alternatives for consideration, we look first to the intended purpose of the proposed action."[141] The primary purpose of the proposed action is for Berry Petroleum to "exercise their lease rights, and develop oil and gas resources within their existing federal oil and gas leases, located on the South Unit of the Ashley National Forest."[142] The record reflects that the FEIS thoroughly evaluated each alternative, and determined that Alternative 4 is the preferred alternative because it has the least impacts to sage grouse.[143] The FEIS, in its thorough

---

[138] AR61285.

[139] AR61287.

[140] *Id.*

[141] *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1041 (10th Cir. 2001).

[142] AR61284.

[143] AR61475.

analysis, further noted that Alternative 4, although the preferred alternative, still leads to adverse impacts to the Anthro sage grouse population and therefore, mitigation measures will be required to protect sage grouse and sage grouse habitat.[144] The FEIS then proceeds to propose an extensive list of mitigation measures.[145]

Petitioner's argument that the Forest Service should have considered a management alternative based on the NTT Report is incorrect. Given the established objectives of the proposed action, Petitioner fails to show that an alternative based on the NTT Report would accomplish the purpose and objective of the proposed action. That is because, as Respondents point out, the NTT Report "simply offers guidance intended for the ongoing range-wide planning process for the sage grouse."[146] It is the agency's discretion to define the purpose and objectives of a proposed action and determine the range of alternatives that must be discussed.[147] The reviewing court need only determine whether the agency's range of alternatives is outside the rule of reason and practicality and whether the range of alternatives considered are sufficient to permit a reasoned choice among the options.[148]

The record reflects that the Forest Service's range of alternatives is not outside the rule of reason and practicality. Petitioner is unlikely to demonstrate that the Forest Service's analysis was arbitrary and capricious.

---

[144] *Id.*

[145] AR61475-80.

[146] Respondents' Opposition at 48.

[147] *Wyoming v. U.S. Dep't of Agric.,* 661 F.3d 1209, 1244 (10th Cir. 2011).

[148] *Biodiversity Conservation Alliance v. Jiron,* 762 F.3d 1036, 1083 (10th Cir. 2014) (quoting *Wyoming,* 661 F.3d at 1243 (quotations omitted)).

**c. The Forest Service has not failed to update its Sage-Grouse Mitigation**

Petitioner asserts that "the Forest Service based its [2012] ROD squarely on the pledge that the agency would consider current research, policy and planning as it made decisions on elements of the 400-well Project that had the potential to impact sage-grouse . . . ."[149] Petitioner argues that

> despite [the Forest Service's] commitment and legal obligation to stay up-to-date on sage-grouse studies and to incorporate the latest science into its management of the 400-well Project, the Forest Service has refused to revise or supplement its NEPA review to address the NTT Report and subsequent analyses that show the agency's mitigation measures are inadequate and the 400-well Project is likely to impair the viability of the Anthro Mountain sage-grouse.[150]

In response, Respondents state that Petitioner's argument that the Forest Service failed to prepare a supplemental NEPA analysis "is not properly before the Court. But even if it were, it ignores [the Forest Service's] process for considering new information regarding the sage grouse and so is unlikely to succeed."[151]

According to Respondents, the argument is not properly before the court because Petitioner did not raise a failure to act claim under 5 U.S.C. § 706(1) in its amended petition, or otherwise allege that the Forest Service had failed to prepare a required supplemental NEPA analysis.[152] Also, Petitioner's opening merits brief did not adequately raise a supplemental NEPA claim.[153] Thus, Respondents argue that "Petitioner cannot cure these fatal flaws by asserting in its motion for preliminary injunction that supplemental NEPA analysis is required."[154]

---

[149] Motion at 60.

[150] *Id.* at 61.

[151] Respondents' Opposition at 49.

[152] *Id.*

[153] *Id.*

[154] *Id.*

Furthermore, Respondents state that the argument is unlikely to succeed because "Petitioner never submitted any 'subsequent analysis' of the sage grouse to [the Forest Service] for its consideration."[155] Therefore, Petitioner "cannot now claim that the [Forest Service] arbitrarily failed to consider a study never presented to the agency."[156] Respondents further argue that even if the studies in question had been presented to the Forest Service for consideration, "Petitioner fails to explain how these extra-record studies 'provide[] *a seriously* different picture of the environmental landscape such that another hard look is necessary.'"[157] As additional support for its position, Respondents point out that the Forest Service prepared a SIR to consider new information, and that "[t]he SIR explains that the new studies regarding the sage grouse offer very little new information regarding existing lease rights and do not seriously alter the analysis of impacts in the FEIS, . . . nor do they alter [the Forest Service's] conclusion that the mitigation measures in the ROD will be effective and are largely consistent with the NTT Report."[158]

Petitioner replies that the Forest Service's arguments that Petitioner never submitted subsequent analysis for consideration "ring hollow" because "there was no notice, no opportunity to augment the record and no 'normal administrative process' in which to participate."[159] Petitioners state they are referring to regulations that require the Forest Service to "provide notice of or solicit information from the public relevant [to] the proposed SUPOS, APDs and SUPO approvals,"[160] "undertake scoping for its planned actions on the SUPOs or

---

[155] *Id.*

[156] *Id.* at 50.

[157] *Id.* (quoting *State of Wisconsin v. Weinberger*, 745 F.2d 412, 419 (7th Cir. 1984)).

[158] Opposition at 51. SIR06–09; SIR27–41.

[159] Reply at 46–47.

[160] *Id.* at 46 (citing 36 C.F.R. §§ 228.107(a) & (a)(4); 40 C.F.R. §§ 1506.6(a), (b) & (d)).

invite agency, tribal or public participation in its decision making,"[161] "notify the public of its SUPO decisions or the opportunity to appeal those decisions,"[162] and "post the APDs physically and on the internet."[163]

"An agency is required to prepare a supplemental . . . FEIS if . . . '[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[164] "The duty to prepare a supplemental EIS is based on the need to facilitate informed decision-making."[165] A supplemental EIS is required only if the new information "is sufficient to show [the proposed action] will affect the quality of the human environment in a significant manner or to a significant extent not already considered."[166] The Tenth Circuit has recognized, however, that an agency does not have to supplement an EIS "every time new information comes to light."[167] "To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."[168] "Courts review an agency decision regarding the need for a supplemental EIS under the 'arbitrary and capricious' standard of the APA, 5 U.S.C. § 706(2)(A)."[169] "The arbitrary and capricious standard of review is a 'narrow one,' which mandates considerable deference to agency decisions."[170]

---

[161] *Id.* (citing 36 C.F.R. §§ 220.4(e)(1) & (2); 40 C.F.R. § 1501.7(a)(1)).

[162] *Id.* ( 36 C.F.R. § 228.107(c)).

[163] *Id.* (citing  72 Fed. Reg. 10334).

[164] *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1257 (10th Cir. 2011) (quoting 40 C.F.R. § 1502.9(c)(1)(i)–(ii)).

[165] *Id.*

[166] *Friends of Marolt Park v. U.S. Dept. of Transp.*, 382 F.3d 1088, 1096 (10th Cir.2004) (quoting *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 374 (1989)) (internal quotation marks omitted).

[167] *Marsh,* 490 U.S. at 371.

[168] *Id.* at 373.

[169] *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1524 (10th Cir. 1992).

[170] *Id.*at 1527.

For the reasons already discussed in Section 1(a) above, the record does not reflect that the NTT Report presents any significantly new information or study relevant to the environmental concerns of the Project and bearing on the proposed action or its impacts. As previously mentioned, the Forest Service discussed the latest science and findings in the FEIS, which included a majority of studies underlying the NTT Report. Petitioner has not identified any particular study contained or cited in the NTT Report that is considered new information that "will affect the quality of the human environment in a significant manner or to a significant extent not already considered."[171] Given that the environmental impacts have been fully considered, Petitioner is unlikely to demonstrate that the Forest Service's decision not to issue a supplemental EIS based on the NTT Report was arbitrary or capricious.

### d.   The Forest Service has not violated NFMA by failing to consider the NTT Report

Petitioner argues that "[b]y failing to adopt 'the latest science and best biological judgment,' or to explain adequately why . . . [the NTT Report] is to be disregarded, the Forest Service has run afoul of NFMA."[172] According to Petitioner, "[u]nder NFMA, any permits, contracts, and other instruments for the use and occupancy of National Forest System lands must be consistent with the relevant [F]orest [P]lan."[173] Petitioner states that the Forest Plan requires the Forest Service to "manage the habitat of all sensitive animal species to maintain or enhance their status[,]"[174] and maintains that "management activities will be allowed if they will not adversely affect any . . . sensitive species."[175] Petitioner contends that "in light of the NTT

---

[171] *Marsh*, 490 U.S. at 3774 (internal quotation marks omitted).

[172] Motion at 58.

[173] *Id.* at 12 (citing 16 U.S.C. § 1604(i)).

[174] *Id.* at 58 (citing AR856).

[175] *Id.* (citing FSM 2670.32(3); 16 U.S.C. § 1604(i)).

Report, the [Forest Service] has met none of these Forest Plan directives."[176] Petitioner proceeds to challenge the effectiveness of the Forest Service's mitigation measures by comparing certain portions of the NTT Report to the mitigation measures in the ROD.[177] Petitioner concludes that "because the Forest Service cannot, in light of the NTT Report, maintain that the 400-well project will have no more than minimal impact on the Anthro Mountain sage-grouse, the agency has failed its legal obligations."[178]

Respondents contend that Petitioner is unlikely to succeed on this claim.[179] Respondents agree that the NFMA requires the Forest Service to ensure that projects are "consistent" with the standards in the governing Forest Plan.[180] Respondents, however, conclude that the Project is consistent with the Forest Plan's standard for sensitive species because of the ten mitigation measures adopted by the Forest Service to minimize or prevent any adverse impacts to the sage grouse.[181] Respondents argue that Petitioner's two main contentions on this matter are unlikely to succeed.[182] First, the Forest Service is not required to adopt the recommendations in the NTT Report as argued by Petitioner.[183] And second, the differences between the NTT Report and the mitigation measures in the ROD do not render the Forest Service's decision to approve the Project arbitrary and capricious.[184]

---

[176] Motion at 58.

[177] *Id.* at 59–60.

[178] *Id.* at 60.

[179] Respondents' Opposition at 51.

[180] *Id.*

[181] *Id.*

[182] *Id.*

[183] *Id.*

[184] *Id.*

Responding to the argument that the NTT Report imposes binding standards on the project, Respondents argue that "[t]he [NTT] Report provides preliminary guidance, expressed as goals and objectives, which still need to be evaluated and adjusted through [the Forest Service's] and BLM's region-wide planning process for the sage grouse."[185] Respondents point out that the Forest Service "acknowledged these crucial disclaimers in the FEIS," and explained that "it is not required to meet the protections listed in the NTT Report unless and until they become part of the Forest Plan."[186] Respondents also state that even if the NTT Report was assumed to be binding, the Report provides "exceptions for existing lease rights, such as those at issue in this Project."[187] Respondents argue that the BLM, under its regulations, "can impose 'reasonable measures' on existing leases such as changes to the 'siting or design of the facility,' but cannot 'require that operations be sited off the leasehold.'"[188] Respondents maintain that "[g]iven this limitation, the [NTT] Report candidly recognizes that BLM must evaluate whether its recommendations are even 'reasonable' with the valid existing rights."[189]

As for Petitioner's contention that the NTT Report renders the mitigation measures in the ROD arbitrary and capricious. Respondents argue that "the NTT Report does not 'specifically dispute[] the effectiveness of [the Forest Service's] core mitigation measures' selected in the ROD."[190] Respondents contend that "Petitioner's argument rests on its interpretation of the NTT Report. But that is not a basis for invalidating [the Forest Service's] reasoned analysis of the

---

[185] *Id.*at 52 (citing AR63493; AR64263).

[186] Respondents' Opposition at 52 (citing AR64262-63).

[187] *Id.*

[188] *Id.* (quoting 43 C.F.R. § 3101.1-2).

[189] *Id.* (AR63510).

[190] Respondents' Opposition at 54.

[NTT] Report."[191] Respondents explain the reasons for the variance between the recommendations found in the NTT Report and the ten mitigation measures that the Forest Service ultimately adopted.[192] Respondents ultimately conclude that "Petitioner's claim 'boils down to a disagreement over scientific opinions and conclusions' but that is inadequate ground to overturn [the Forest Service's] reasoned decision."[193]  Petitioner Reply Memorandum does not address Respondents' arguments.

NFMA requires the Forest Service to develop a forest plan for every forest within its jurisdiction.[194] Following development of the plan, all projects within the forest must comply with the NFMA and be consistent with the forest plan.[195] It is Petitioner's burden to show an NFMA violation.[196]

Petitioner argues that the NTT Report reveals that the Forest Service's mitigation measures are inconsistent with the Forest Plan's directive that "management activities will be allowed if they will not adversely affect any . . . sensitive species."[197] Specifically, Petitioner contends that "the Forest Service does not and cannot show, *inter alia*, that it is managing sage-grouse habitat to maintain or enhance the species, that the 400-well Project will not adversely affect the sage grouse or that the agency is maintain a viable sage-grouse population on Anthro Mountain[,]"[198] because "the NTT report, based on more than 120 studies, specifically disputes

---

[191] *Id.* (citing *Utahns for Better Transp. v. USDOT*, 305 F.3d 1152, 1168 (10th Cir. 2002) ("a difference of opinion" is an inadequate basis to establish a violation of NEPA)).

[192] Respondents' Opposition at 55–56.

[193] *Id.* at 56–57 (quoting *Custer County Action Association v. Garvey*, 256 F.3d 1024, 1036 (10th Cir. 2001)).

[194] 16 U.S.C. § 1604(a).

[195] *Id.* § 1604(i).

[196] *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008)).

[197] Motion at 58.

[198] *Id.* at 59.

the effectiveness of the Forest Service's core mitigation measures and certainly undermines any claims that those measures will stave off all but minimal impacts."[199] Petitioner's NFMA violation argument is similar to its NEPA violation argument discussed above. Although Petitioner contends that the NTT Report's conclusions and recommendations are based on more than 120 studies, Petitioner does not identify any particular "relevant data" or "relevant factors" contained or cited in the NTT Report that the Forest Service should have examined or considered when establishing the mitigation measures for the Project. Petitioner simple disagrees with the conclusions reach by the Forest Service. However, "'[t]hough a party may cite studies that support a conclusion different from the one the Forest Service reached, it is not our role to weigh competing scientific analyses.'"[200] "We grant considerable discretion and deference to federal agencies on matters that require a high level of technical or scientific expertise."[201] To set aside the Forest Service's mitigation measures would require the court to decide that the conclusions and recommendations of the authors of the NTT Report have more merit than those of the Forest Service's experts. The court is unqualified to make such a determination.

The court's review "is highly deferential."[202] "The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made."[203] "In reviewing the agency's explanation, the reviewing court must determine whether the agency considered all relevant factors and whether there has been a clear error of

---

[199] *Id.* at 58–59.

[200] *Forest Guardians v. U.S. Forest Serv.*, 641 F.3d 423, 442 (10th Cir. 2011) (quoting *Ecology Center v. Castaneda,* 574 F.3d 652, 659 (10th Cir. 2009)).

[201] *Id.*

[202] *Ecology Center v. U.S. Forest Serv.,* 451 F.3d 1183, 1188 (10th Cir.2006) (quotation omitted).

[203] *Olenhouse v. Commodity Credit Corporation, et al.,* 42 F.3d 1560, 1574 (10th Cir. 1994).

judgment."[204] The record shows the Forest Service "examined the relevant data and articulated a

rational connection between the facts found and the decision made."  Petitioner is unlikely to

demonstrate that the Forest Service's decision to not consider the NTT Report was arbitrary or

capricious.

### 2. *The Forest Service did not Err by Failing to Design, Consider and Implement an Alternative that Would Comply with the Roadless Rule and NEPA*

Petitioner argues that the Forest Service violated both NEPA and the Roadless Rule

because it did not consider an alternative that would avoid the destruction of the roadless

character of the Project Area.[205] Respondents contend that "the FEIS analyzed a broad range of

alternatives and was not required to analyze an alternative inconsistent with the purpose and need

of the Project and that violates prior existing lease rights."[206]

### a. The Forest Service did not violate NEPA by not considering a development alternative that would protect roadlessness

Petitioner points out that "NEPA requires federal agencies to '[r]igorously explore and

objectively evaluate all reasonable alternatives.'"[207] And "[i]f an agency fails to examine a viable

alternative, the EIS is unlawful."[208] Petitioner asserts that the Forest Service "evaluated three

development alternatives that would have the same adverse effect on the Roadless Area—the

total obliteration of the roadless character of these lands."[209] By evaluating only three

development alternatives, Petitioner argues that "the Forest Service has run afoul of NEPA, [by]

---

[204] *Id.*

[205] Motion at 61.

[206] Respondents' Opposition at 57.

[207] Motion at 46 (quoting 40 C.F.R. § 1502.14(a); 42 U.S.C. § 4332(2)(C)(iii)).

[208] *Id.* at 47 (citing *New Mexico ex rel. v. BLM*, 565 F.3d 683, 708–11 (10th Cir. 2009)).

[209] *Id.* at 61.

failing to articulate and analyze a range of alternatives that would have different impacts on the undeveloped character of the Roadless Area."[210]

Respondents contend that NEPA requires an agency to only consider reasonable alternatives.[211] "'In determining whether an agency considered reasonable alternatives, courts look closely at the objectives identified in an EIS's purpose and need statement.'"[212] And "'once an agency establishes the objectives of the proposed action—which it has considerable discretion to define—the agency need not provide a detailed study of alternatives that do not accomplish that purpose or objective, as those alternatives are not 'reasonable.'"[213] Respondents state that the purpose and need of the Project "is to respond to [Berry Petroleum's] proposed Master Development Plan 'by identifying terms and conditions to be applied to surface development activities within the [P]roject area.'"[214] According to Respondents, the Forest Service "developed and analyzed four alternatives representing an array of approaches to fulfill the purpose and need of the Project."[215] Besides the four alternatives considered in detail, the Forest Service also "considered a proposed alternative that imposed [No Service Occupancy] NSO stipulations within [Inventoried Roadless Areas] IRAs."[216] The Forest Service rejected the proposed alternative "from detailed consideration because lease stipulations like NSO are developed as part of leasing decisions, prior to issuance of oil and gas leases."[217] And "as

---

[210] *Id.*

[211] Respondents' Opposition at 57 (quoting *Citizens' Comm. to Save Our Canyons v. USFS*, 297 F.3d 1012, 1030 (10th Cir. 2002)).

[212] *Id.* (quoting *Save Our Canyons*, 297 F.3d at 1030).

[213] *Wyoming v. U.S. dept. of Agriculture*, 661 F.3d 1209, 1244 (10th Cir, 2011).

[214] Respondents' Opposition at 58 (quoting AR62052).

[215] *Id.*

[216] *Id.* (citing AR61338–39).

[217] *Id.*

explained in the FEIS, '[a]dding additional NSO stipulations to existing oil and gas leases and proposed oil and gas developments, outside the formal leasing decision, and after the leases have already been sold, violates the terms of the leases in question.'"[218] Thus, Respondents conclude that the Forest Service's "refusal to consider a proposed alternative that does not meet the Project's purpose and need is not arbitrary and capricious."[219]

Petitioner states that "there is nothing in the record to suggest that an alternative that would impose 'reasonable measures as may be required . . . to minimize adverse impacts to other resource values' such as roadlessness, . . . would be 'contrary to valid existing rights.'"[220] Petitioner further states that "the 'purpose and need' for the 400-well Project, which is 'to respond to the . . . proposed [project] by identifying terms and conditions to be applied to surface development' . . . is very broad, and nothing in the record suggests that an alternative that incorporated reasonable measures to reduce impacts to roadlessness would be incompatible with that goal."[221] Petitioner also takes issue with Respondents' reasoning of why they "considered but rejected an alternative that would apply an NSO stipulation to the entirety of the Roadless Areas."[222] Petitioner argues that this rejected alternative "is not in keeping with the Roadless Rule, which allows limited road construction on Roadless Areas and is extreme in its goal of preventing any alteration of roadlessness."[223] Petitioner contends that the Forest Service failed to consider "a reasonable alternative somewhere between prohibiting all surface disturbance on the

---

[218] *Id.* at 58–59 .

[219] *Id.* at 59.

[220] Reply at 22 (citing 43 C.F.R. § 3101.1-2 and 36 C.F.R. §§ 107(a)(3) & 108(a) (operations will be conducted to "minimizes effects on surface resources")).

[221] Reply at 23.

[222] *Id.*

[223] *Id.*

Roadless Areas and three alternatives that would destroy the roadless character of the entire 20,000 acers."[224]

Applying the standard discussed above in section 1(b), Petitioner is unlikely to demonstrate that the Forest Service's decision to not consider other alternatives regarding road construction was arbitrary or capricious. NEPA requires an agency to "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."[225] However, "[o]nce an agency appropriately defines the objectives of an action, NEPA does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or ... impractical or ineffective."[226] Consequently, the range of reasonable alternatives is limited to those alternatives that meet the purpose and need of the proposed action.[227]

The primary purpose of this Project was "to respond to [Berry Petroleum's] proposed MDP by identifying terms and conditions to be applied to surface development activities within the project area."[228]  Based on this stated purpose, the Forest Service considered several alternatives, but decided to limit the alternatives considered in detail to those that conformed to Berry Petroleum's vested legal right to develop its leases.[229] The Forest Service ultimately considered four alternatives that met the purpose and need of the proposed action. The

---

[224] *Id.*

[225] 40 C.F.R. § 1502.14(a).

[226] *Citizens' Comm. to Save Our Canyons,* 297 F.3d at 1030 (quoting *All Indian Pueblo Council v. United States,* 975 F.2d 1437, 1444 (10th Cir.1992)) (internal quotations marks omitted).

[227] *Biodiversity Conservation Alliance v. Jiron,* 762 F.3d 1036, 1083 (10th Cir. 2014) (quoting 40 C.F.R. §§ 1502.13, 1502.14(a)).

[228] AR62052.

[229] AR61338–39.

alternative the Forest Service considered but decided to eliminate from detailed study imposed NSO stipulations within IRAs.[230] The Forest Service eliminated this alternative from further analysis because it determined that

> [c]reating additional NSO stipulations, for IRAs within the Project Area, could potentially eliminate as many as 258 of the 374 proposed well pad locations, and eliminate road construction to those locations, thereby preventing needed and reasonable access to the minerals already leased within those areas. Preventing reasonable access in these areas would therefore prevent the lease holder from developing existing lease rights and would be contrary to the Mineral Leasing Act and the purpose and need for the project.[231]

The Forest Service met its burden in briefly discussing the reasons for eliminating the fifth alternative from detailed analysis.[232] Petitioner's contention that "nothing in the record suggests that an alternative that would impose 'reasonable measures as may be required . . . to minimize adverse impacts to other resource values' such as roadlessness, . . . would be 'contrary to valid existing rights[,]'" is misguided given the narrow and deferential judicial review of the agency's decision. Petitioner has the burden of demonstrating a violation of NEPA. Petitioner cannot meet its burden by simply arguing that "nothing in the record suggests" that an alternative that imposes measures to minimize adverse impacts would be contrary to existing rights. Petitioner must show that the Forest Service's decision to not analyze other alternatives it rejected as either too remote, speculative, impractical or ineffective was not in good faith, and was arbitrary or capricious. An agency's range of alternatives is reviewed under a "rule of reason" standard that requires an agency to set forth only those alternatives necessary to permit a reasoned choice.[233] This court's review "is highly deferential."[234] "[D]eference to the agency is

---

[230] *Id.*

[231] *Id.*

[232] 40 CFR § 1502.14(a).

[233] *Ass'ns Working for Aurora's Residential Env't v. Colo. Dep't of Transp.,* 153 F.3d 1122, 1130 (10th Cir.1998).

[234] *Ecology Center v. U.S. Forest Serv.,* 451 F.3d 1183, 1188 (10th Cir.2006) (quotation omitted).

especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise'"[235]

In light of purpose and need of the proposed action, the administrative record reflects that the range of alternatives offered by the Forest Service was reasonable and allowed for informed decision-making. Petitioner is unlikely to demonstrate that the Forest Service violated NEPA by not considering a development alternative that would protect roadlessness.

### b.  The Forest Service did not violate the Roadless Rule requirement by not protecting roadless areas

Petitioner asserts that "road construction or reconstruction associated with pre-2001 mineral leases is permissible only as 'needed,' and 'must be conducted in a manner that minimizes effects on surface resources, [and] prevents unnecessary or unreasonable surface disturbance[.]'"[236] Based on these requirements, Petitioner argues that "the record must show both how the Forest Service evaluated the adverse effect of project roads and attendant development on the undeveloped character of the Roadless Areas with the goal of minimizing the impact and the steps it took to actually minimize this impact."[237] According to Petitioner, "nothing in the record shows that the Forest Service determined that 42.3 miles of roads in the Roadless Areas were 'needed,' how the agency strove to minimize impacts to the undeveloped nature of the Roadless Areas or depicts the actions the agency actually took to minimize those impacts."[238]

---

[235] *Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677, 691 (10th Cir. 2010) (quoting *Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 824 (10th Cir. 2008)).

[236] Motion at 62 (quoting 36 C.F.R. § 294.12(b)(7)).

[237] *Id.* (citing *Central Sierra Environmental Resource Center v. USFS*, 916 F.Supp.2d 1078, 1095–97 (E.D. Cal. 2013)).

[238] *Id.* at 63.

Petitioner contends that "the Forest Service [may not] justify its failure to consider and implement a development alternative that would avoid the total obliteration of the roadless character of the Roadless Areas by insisting that it: 1) may not impose additional stipulations on the South Unit leases, or, 2) must 'allow up to one [well] location per 40 acres[.]"[239] Petitioner argues that the Forest Service may not insist on the former justification because in another pending motion in this case, "the Forest Service repeatedly takes the position that it is authorized to impose on the South Unit leases 'new' stipulations . . . and 'new' 'mitigation measures' that prohibit surface disturbance and restrict spacing of wells."[240] And as for the latter justification, Petitioner argues that "the record confirms that the Forest Service contradicts its own position when it implies that it must allow the Operator to construct one well on every 40 acres in the Project Area."[241] "[T]he Forest Service itself has restricted development in certain portions of the Project Area to less than one well per 40-acres spacing."[242] Petitioner concludes that there must be "a reasonable alternative somewhere between prohibiting any surface disturbance on the Roadless Areas and three alternatives that would destroy the roadless character on the entire 20,000 acres."[243]

Respondents argue that Petitioner's "claim mischaracterizes the 2001 Roadless Rule and misapplies its provisions."[244] According to Respondents, "the Roadless Rule specifically excepts the development of mineral leases from its roadbuilding prohibitions if leases were issued prior

---

[239] *Id.* at 63 (citing AR64258–62, AR61990).

[240] *Id.* (citing to Federal Respondents' Partial Motion to Dismiss and Memorandum in Support of Partial Motion to Dismiss, docket no. 25, filed July 18, 2014).

[241] *Id.* at 64.

[242] *Id.*

[243] *Id.* at 65.

[244] Respondents' Opposition at 59.

to January 12, 2011, as is the case here."[245] Respondents contend that Petitioner is incorrect when it claims that the Forest Service is required by the Roadless Rule to actually minimize the impact of the Project. Respondents state that the case relied upon by Petitioner for this assertion dealt with the Travel Management Rule, 36 C.F.R. § 212.55(b), and the 2001 Roadless Rule does not contain the same requirements. Respondents state that "[i]n any event, the record demonstrates that [the Forest Service] evaluated effects from road development and shows that it took steps to minimize adverse impacts on the environment."[246]

Regarding Respondents' authority to impose new stipulations and new mitigation measures that prohibit surface disturbance and restrict spacing of wells, Respondents assert that "Petitioner conflates the ability to include mitigation measure with the right to impose further NSO stipulations for leases. The former is allowed under mineral leasing regulations, the latter are not."[247] And any restrictions imposed by the Forest Service "on the development of a lease must be 'consistent with lease rights granted.'"[248] For example, these restrictions "may not 'require relocation of proposed operations by more than 200 meters; require that operations be sited off the leasehold; or prohibit new surface disturbing operations for a period in excess of 60 days in any lease year.'"[249] Respondents further argue that "the fact that the BLM and [the Forest Service] subsequently imposed additional restrictions and mitigation measures on the development of certain leases in the South Unit [does not] provide Petitioner with a basis to

---

[245] *Id.* (citing 36 C.F.R. § 294.12 (2001)).

[246] Opposition at 60 (citing AR61333 (analysis of alternative to "minimize surface disturbance"); AR61322-23 (consideration of the no action alternative); 62062-63 (ROD); 15589-92 (summary of minimization efforts)).

[247] Opposition at 61 (citing 36 C.F.R. § 228.102(e); 43 C.F.R. § 3101.7-2(a), (b)).

[248] *Id.* (citing 43 C.F.R. § 3101.1-2).

[249] *Id.*

request even more restrictions."[250] Any additional restrictions imposed by the Project ROD "are consistent with the underlying terms of the leases and the regulations, as required by 43 C.F.R. § 3101.1-2."[251] In sum, Respondents state that the Forest Service "considered a reasonable range of alternatives in detail in the FEIS and reasonably rejected those alternatives that did not further the defied purpose of the Project."[252]

Petitioner replies that while "section 294.12(b)(7) allows some road building, its purpose remains to 'limit the potential impacts on roadless area characteristics within the identified set of lands.'"[253] Petitioner states that the Forest Service must comply with section 294.12(b)(7), and "the record must reflect a 'careful evaluation' of whether any project road is needed and is constructed in a way that minimizes impacts to surface resources and prevents unnecessary or unreasonable surface disturbance."[254] Petitioner contends that the "record, however, contains no such evaluation and does not evidence either an effort to minimize impacts to roadlessness or the accomplishment of this goal."[255] "Moreover, rather than achieving any sort of minimization of the impacts of project roads and development on the roadless Areas, the agency concedes that the implementation of the 400-well project will lead to the entire destruction of roadless character of the Project Area."[256] Thus, "[g]iven that the Selected Alternative, along with all the action alternatives . . . will result in the obliteration of the 20,000 acres of roadlessness in the Project

---

[250] *Id.*

[251] *Id.* at 62.

[252] *Id.*

[253] Reply at 24 (citing 66 Fed. Reg. 3256).

[254] *Id.*

[255] *Id.* (citing *Central Sierra Environmental Resource Center v. USFS*, 916 F.Supp.2d 1078, 1095- 97 (E.D. Cal. 2013) (in context of Executive Order requiring agency to minimize harm when designating trails and areas, holding "the Forest Service must show that it satisfies the objective of minimizing environmental impacts. This means the Forest Service must do more than merely consider those impacts.")).

[256] *Id.* at 25 (citing AR61566–68).

Area, it can hardly be said that the agency was to any degree successful in complying with section 294.12(b)(7) and minimizing the impact of the road building it authorized on the undeveloped character of the Roadless areas."[257]

The Roadless Area Conservation Rule ("Roadless Rule") was promulgated in 2001.[258] Subject to limited exceptions, the Roadless Rule prohibits road construction, reconstruction, and timber harvest in roadless areas.[259] The Roadless Rule has had a long history in the federal courts. It has been challenged on several occasions, and has been enjoined by at least two federal district courts. The United States District Court for the District of Idaho enjoined preliminarily the implementation of the rule two days before the rule was supposed to go into effect.[260] The following year, however, the Ninth Circuit Court of Appeals reversed the district court's issuance of the preliminary injunction.[261] A few months after the Ninth Circuit's ruling, the United States District Court for the District of Wyoming held, on July 14, 2003, that the Roadless Rule violated NEPA and the Wilderness Act and permanently enjoined the Rule.[262] While the district court's permanent injunction was on appeal before the Tenth Circuit, the Forest Service, in May of 2005, "adopted the State Petition Rule, which superseded the Roadless Rule."[263] "Because the Roadless Rule had been superseded, . . . [the Tenth Circuit] dismissed the appeal as moot, vacated the district court's July 14, 2003, decision, and remanded the case to the

---

[257] *Id.* at 25.

[258] Special Areas, Roadless Area Conservation, 66 FR 3244-01.

[259] 66 FR at 3272.

[260] *See Kootenai Tribe of Idaho v. Veneman,* No. 01–10, 2001 WL 1141275, at *2 (D.Idaho May 10, 2001).

[261] *See Kootenai Tribe of Idaho v. Veneman,* 313 F.3d 1094, 1126 (9th Cir.2002).

[262] *See Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1226 (10th Cir. 2011); *Wyoming v. U.S. Dep't of Agric.,* 277 F.Supp.2d 1197, 1239 (D.Wyo.2003).

[263] *Wyoming,* 661 F.3d 1226.

district court to dismiss without prejudice."[264] In October 2005, the State Petition Rule was set aside by a district court judge "for violating NEPA and the Endangered Species Act of 1973, 15 U.S.C. §§ 1531-44, and reinstated the Roadless Rule, despite the fact that the Wyoming district court had already found that the rule violated federal law."[265] After the Roadless Rule was reinstated, "Wyoming brought a renewed challenge to the rule in the District of Wyoming . . . ."[266] "On August 12, 2008, the Wyoming district court ruled—for the second time—that the Roadless Rule was promulgated in violation of the Wilderness Act and NEPA, and issued a permanent, nationwide injunction."[267] In October 2011, the Tenth Circuit overruled the Wyoming District Court and remanded the case with instructions to vacate the injunction.[268] The Wyoming District Court vacated its permanent injunction on the Roadless Rule on March 1, 2012.[269]

Against this procedural backdrop, two issues emerge: (1) whether the Forest Service was subject to the Roadless Rule when it approved the Project; and (2) if subject to the Roadless Rule, did the Forest Service comply with the Rule. Regarding the first issue, as the above procedural history reveals, the Roadless Rule was not in effect during most of the scoping, planning, and drafting of the EIS. In 2007, the Forest Service published a notice of intent to prepare an EIS, and solicited public comments at the scoping stage.[270] In August 2008, the Wyoming District Court's permanent nationwide injunction went into effect, and the injunction

---

[264] *Id.* (citing *Wyoming v. U.S. Dep't of Agric.,* 414 F.3d 1207, 1213 (10th Cir.2005)).

[265] *Id.* (citing *California ex rel. Lockyer v. U.S. Dep't of Agric.,* 459 F.Supp.2d 874 (N.D.Cal.2006)).

[266] *Id.*

[267] *Id.* (citing *Wyoming v. U.S. Dep't of Agric.,* 570 F.Supp.2d 1309, 1355 (D.Wyo.2008)).

[268] *Id.* at 1272.

[269] *Wyoming v. U.S. Dep't of Agric.*, case no. 2:07-cv-00017-CAB, docket no. 201, field March 1, 2012.

[270] AR1925–26, 1554–56.

was not vacated until a month after the Forest Service issued its FEIS.[271] Based on the above, the Roadless Rule was not in effect until March 2012, and therefore did not apply to the February 2012 FEIS and ROD. At the January 26, 2016 Motion Hearing, Petitioner generally agreed that the Roadless Rule did not apply to the February 2012 FEIS.[272] Petitioner's counsel stated that the question of whether the Roadless Rule applied to the February 2012 FEIS "is sort of moot because the point is is [*sic*] that they certainly have to comply with it now."[273] Petitioner cited to a list of approved SUPOs and argued that the Roadless Rule was required to be considered during the approval of each of the SUPOs.[274] Accordingly, under the first issue, it appears that the Forest Service was not subject to the Roadless Rule when it approved the 2012 FEIS and ROD.

Respondents at the January 26, 2016 Motion Hearing argued that because the leases in question were issued in 1997, prior to the enactment of the Roadless Rule in 2001, the Roadless Rule does not apply to any of the subsequent actions by the Forest Service, *i.e.* SUPO approvals.[275] Respondent pointed out that when the project reaches Phase B, the Roadless Rule maybe considered, but Petitioner's current argument is lacking merit.[276] Berry Petroleum agreed with Respondents, and further underscored that "[t]his Court's jurisdiction exists to review the 2012 record of decision and the final environmental impact statement. That decision approved all of the SUPOs and APDs that have been listed in WildEarth Guardians' brief. But they want to

---

[271] AR61282–62042.

[272] January 26, 2016 Motion Hearing Transcript at 20:6-13.

[273] *Id.* at 20:12-13.

[274] *Id.* at 20-25.

[275] *Id.* at 27:19-38

[276] *Id.* at 28:30:10.

make each one of those ministerial acts a new decision."[277] Petitioner, at the hearing, replied that although the leases in question are pre-Roadless Rule leases, the Roadless Rule "explicitly says that, the department has decided to address the issue of roads and surface disturbance relative to development on leases that predate the Roadless Rule."[278] The Federal Register specifically states:

> Existing leases are not subject to the prohibitions. The Department has decided to adopt a more limited exception at 36 CFR 294.12(b)(7) to allow road construction needed in conjunction with the continuation, extension, or renewal of a mineral lease, on lands that were under lease by the Secretary of the Interior as of the date of publication of this rule in the Federal Register. . . . Such road construction or reconstruction must be conducted in a manner that minimizes effects on surface resources, prevents unnecessary or unreasonable surface disturbance, and complies with all applicable lease requirements, land and resource management plan direction, regulations, and laws. Roads constructed or reconstructed pursuant to this paragraph must be obliterated when no longer needed for the purposes of the lease or upon termination or expiration of the lease, whichever is sooner.[279]

26 CFR 294.12(b)(7) states in turn:

> A road is needed in conjunction with the continuation, extension, or renewal of a mineral lease on lands that are under lease by the Secretary of the Interior as of January 12, 2001 or for a new lease issued immediately upon expiration of an existing lease. Such road construction or reconstruction must be conducted in a manner that minimizes effects on surface resources, prevents unnecessary or unreasonable surface disturbance, and complies with all applicable lease requirements, land and resource management plan direction, regulations, and laws. Roads constructed or reconstructed pursuant to this paragraph must be obliterated when no longer needed for the purposes of the lease or upon termination or expiration of the lease, whichever is sooner.[280]

Ultimately, at the hearing, it was Petitioner's position that the requirement for the application of the Roadless Rule to each individual SUPOs approval comes from 36 C.F.R. § 228.107(a), which requires the Forest Service to determine whether a lease is in keeping with

---

[277] *Id.* at 31:19-24.

[278] *Id.* at 32:6-16.

[279] Special Areas, Roadless Area Conservation, 66 FR 3244-01 at 3256.

[280] *Id.* at 3271–72.

federal law. Petitioner states that because the Roadless Rule is federal law, then the Forest Service has an obligation to determine if its actions in approving a SUPO are in keeping with that.[281]

The issue of whether the Roadless Rule was required to be considered during the approval of each of the SUPOs does not appear to be properly before the court. 36 C.F.R. § 228.107 directs the Forest Service to "ensure that: (1) The surface use plan of operations is consistent with the lease, including the lease stipulations, and applicable Federal laws[.]"[282] This section also provides that "[t]he authorized Forest officer shall give public notice of the decision on a surface use plan of operations and include in the notice that the decision is subject to appeal under 36 CFR part 214 or 215."[283] 36 CFR § 214.20 in turn states: "Per 7 U.S.C. 6912(e), judicial review of a decision that is appealable under this part is premature unless the plaintiff has exhausted the administrative remedies under this part."[284] It does not appear from the record that Petitioner exhausted its administrative remedies pursuant to 36 CFR § 214. Petitioner states that "the Forest Service did not notify the public of its SUPO approvals or the opportunity to appeal those decisions."[285] Neither party briefed whether individual SUPO approvals may be reviewed by a court under these circumstances. Thus, a decision on this issue at this time would be inappropriate.

---

[281] January 26, 2016 Motion Hearing Transcript at 35:19-36:8.

[282] 36 C.F.R. § 228.107(a)(1).

[283] *Id.* § 228.107(c).

[284] 36 C.F.R. § 214.20.

[285] Reply at 6.

### 3. The Forest Service did not Fail To Assess Impacts To Air Quality And To Comply With Air Quality Standards

#### a. The Forest Service did not rely on an unsupported and unexplained 24-Hour PM$_{2.5}$ background concentration

Petitioner argues that the Forest Service violated NEPA because it did not properly support or explain its decision to set the 24 hour PM$_{2.5}$ background concentration level at a value of 27.6ug/m$^3$. Petitioner points out that the Forest Service in the FEIS cites "Environ 2010" as the source of the 27.6 ug/m$^3$ value, but it contends that "no such document was made available to the public or commenting agencies, was attached to the FEIS or was listed as a reference in either the FEIS, or the supporting documents."[286] Petitioner states that "NEPA does not countenance such a lax approach to public disclosure or well-informed decision making."[287] Petitioner also states that the background concentration level is further unsupported by the record because "[t]he record does not provide any basis for the number, such as the location of the monitors or frequency of monitoring that purport to support the 27.6 ug/m$^3$ value or the timeframe during which the monitoring took place."[288] Petitioner concludes that due to the Forest Service's violation, "neither the public nor commenting agencies can assess the accuracy or validity of the estimate."[289]

In response, Respondents first state that the background concentration for 24-hour average PM$_{2.5}$ of 27.6 μg/m$^3$ is not perfunctory because it was obtained from UDAQ, the expert

---

[286] Motion at 66.

[287] Id. (citing 40 C.F.R. § 1502.18(a)&(b) (EIS appendix "shall . . . [c]onsist of material prepared in connection with an [EIS] (as distinct from material . . . not so prepared and . . . which is incorporated by reference)" and "[n]ormally consist of material which substantiates any analysis fundamental to the [EIS].");  Id. at § 1502.21 ("No material may be incorporated by reference unless . . . reasonably available for inspection by…interested persons within the time allowed for comment.");  Pacific Rivers v. USFS, 668 F.3d 609, 628 (9th Cir. 2012) ("purpose of an EIS . . . to inform decisionmakers and the general public . . . defeated if a critical part of the analysis could be omitted from an EIS and appendices")).

[288] Id.

[289] Id.

local agency.[290] According to Respondents, "[t]he UDAQ specifically recommended using the PM$_{2.5}$ background value of 27.6 mg/m$^3$ for a 24-hour average 98% value. This value represents an appropriate average winter background, as PM$_{2.5}$ values are typically highest in winter."[291]

Respondents state that "ENVIRON2010 is merely a summary of other documents that were made available to the public during the administrative process and all are included in the Administrative Record."[292] Respondents point out that "Courts have held that NEPA requires the public to have access to the underlying data from which an expert derived its opinions."[293]

Respondents also take issue with Petitioner's argument that the Forest Service failed to make available the location of monitors or frequency of monitoring to support the value of 27.6 μg/m$^3$. Respondents state that the Forest Service explained its decision to use this background number,[294] and UDAQ data is and has been readily available online for review.[295] Finally, Respondents contend that the Record demonstrates that the Forest Service adequately explained and disclosed accurate information regarding the Forest Service's modeling for PM$_{2.5}$ background information.[296] Respondents point out that the FEIS discloses various air quality

---

[290] Respondents' Opposition at 70 (citing AR2606).

[291] *Id.* (citing AR64271).

[292] *Id.* at 72 (citing AR2387-94; AR62122–23).

[293] *Id.* (citing *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998), as amended on denial of reh'g (May 13, 1998) *overruled by The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) ("As both of these results are unacceptable, we conclude that NEPA requires that the public receive the underlying environmental data from which a Forest Service expert derived her opinion.") and *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1214 (9th Cir. 2004) ("This does not mean, however, that an EIS cannot provide such data by incorporating a document by reference, as was done with the biological opinions here. The Guidelines specifically allow for incorporation by reference and instruct agencies to use this method 'when the effect will be to cut down on bulk without impeding agency and public review of the action.' 40 C.F.R. § 1502.21.")).

[294] *Id.* (citing AR61370; AR2386–90; AR2606; AR62122–23).

[295] Respondents' Opposition at 70 (*see* Utah Dep't of Envtl. Quality, http://www.airmonitoring.utah.gov/dataarchive/archpm25.htm).

[296] *Id.*

scenarios that may occur during the life of the Project.[297] And "using these conservative but more realistic assumptions, the $PM_{2.5}$ ambient air quality standard will be met."[298] And "[i]n any event, an exceedance does not necessarily equate to a violation of the $PM_{2.5}$ NAAQS."[299] Respondents conclude that the Petitioner is unlikely to succeed on the merits of this claim, because the Forest Service "properly disclosed the background data for its air quality analysis. The record demonstrates that [the Forest Service] adequately analyzed and disclosed the potential impacts of the Project on $PM_{2.5}$ background concentration data."[300]

Petitioner, in regards to ENVIRON2010, replies that "[n]othing in the FEIS gave the reader any inkling of what ENVIRON2010 was or where it could be found – much less the identity or location of the 'other' documents it supposedly summarized. This approach runs afoul of NEPA."[301] As for giving the basis for the background concentration, Petitioner contends that the Forest Service is wrong when it states that "UDAQ data is and has been readily available online for review." Petitioner argues that "no data for an Ouray monitor is on the state's website – although periodic monitoring data from the Vernal monitor does appear."[302] Finally, Petitioner points out that by the Forest Service stating that "an exceedance does not necessarily equate to a violation" of a standard, this "itself claims that its model shows 'noncompliance' with the NAAQS."[303]

---

[297] *Id.* at 71 (citing AR61744–56 (near field analysis and scenarios)).

[298] Respondents' Opposition at 71 (citing AR61750–51).

[299] *Id.* at 71 (citing 40 C.F.R. Pt. 50, App. N at 4.2(b) (explaining that the 24-hour $PM_{2.5}$ NAAQS at issue is met when the three-year average of the annual 98th percentile of values at designated monitoring sites in an area is less than or equal to 35 micrograms per cubic meter)).

[300] *Id.* at 72–73.

[301] Reply at 35–36; Motion at 66 (cases and regulations cited therein).

[302] Reply at 36.

[303] *Id.*

An agency's failure to adequately consider a relevant and significant aspect of a problem may render its rulemaking arbitrary and capricious.[304] "A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"[305] It is undisputed that in setting the background concentration for 24-hour average $PM_{2.5}$ to 27.6 ug/m$^3$, the Forest Service relied on UDAQ, the expert local agency on air quality matters.[306] Petitioner does not dispute that UDAQ recommended using the $PM_{2.5}$ background value of 27.6 mg/m$^3$.

Instead Petitioner argues that the record does not support this background concentration level because it is missing, among other things, "the location of the monitors or frequency of monitoring . . . or the timeframe during which the monitoring took place."[307]  Petitioner also argues that the Forest Service violated NEPA because it cited to a document (ENVIRON 2010) in the FEIS but did not make the document available to the public, or attach it to the FEIS or list it as a reference either in the FEIS or the supporting document. As an initial matter, because the background concentration value was obtained from an expert local agency, the value has a presumption of regularity.[308]

---

[304] *See Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 140 (D.C. Cir. 2005).

[305] *Bowman Transp. Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 285 (1974) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)).

[306] *See* AR64271 (noting Utah Department of Environmental Quality Division of Air Quality specifically recommended the use of the PM2.5 background value of 27.6 mg/m3 for a 24-hour average 98% value); AR2606 (personal communication regarding background information on NAAQS).

[307] Motion at 66.

[308] *Utah Envtl. Cong. v. Dale Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006) ("[A]dministrative agencies generally are afforded a presumption of regularity."). *See e.g. Save the Peaks Coal. v. USFS*, No. CV 09-8163-PCT-MHM, 2010 WL 4961417, (D. Ariz. 2010), *aff'd* 535 F.3d 1058, 1080 (9th Cir. 2012) (affirming USFS's reliance on state agency data); *Colo. Envtl. Coal. v. Dombeck*, 185 F. 3d 1162, 1169, n.8 (10th Cir. 1999) (rejecting contention that Forest Service must itself collect data or commission studies concurrent with its environmental assessment); *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772 (10th Cir. 2006) (affirming Forest Service and BLM reliance on FWS findings in biological assessments in conducting NEPA analysis).

Respondents were asked, at the January 26, 2016 Motion Hearing, whether the background concentration level was supported in the record,[309] whether the documents referenced in ENVIRON2010 were made available to the public,[310] and whether the location of the monitors were made available to the public.[311] They answered yes to all three questions. According to Respondents, the background concentration level is "[i]n the FEIS at page 61357, in Appendix C of the FEIS at 61748."[312] "The ENVIRON 2010 document is found in the record at FSAR2386 through 94. It's clear on its face what it's summarizing. And all of those documents were made available to the public."[313] And the location of the monitors can be found "in the FEIS in the Appendix 61748."[314] Petitioner in response argued that "NEPA requires ready access to these documents, so they need to be incorporated by reference and readily available. And so to say it's somewhere in the administrative record doesn't address the issue of whether as readily available to the public."[315]

Based on the record and argument of the parties, Petitioner is unlikely to demonstrate that the Forest Service violated NEPA. After examining the record, it appears there is support for the 24-hour $PM_{2.5}$ background concentration, documents referenced in ENVIRON2010 were reasonably available to the public and the locations the monitors are provided for in the record.

---

[309] January 26, 2016 hearing at 36:9-12.

[310] *Id.* at 37:11-15.

[311] *Id.* at 41:7-10.

[312] *Id.* at 36:13-19.

[313] *Id.* at 37:16-19.

[314] *Id.* at 41:12-13.

[315] *Id.* at 40:16-20.

b.  **The Forest Service did not violate NEPA by failing to address the secondary formation of $PM_{2.5}$ in its Near Field Analysis**

Petitioner argues that "[t]he secondary formation of $PM_{2.5}$—the formation of fine particles from the reaction of $PM_{2.5}$ precursors in the atmosphere—is a significant source of $PM_{2.5}$."[316] "The pollutants $SO_2$, NO$_X$, VOC and ammonia (NH$_3$) are $PM_{2.5}$ 'precursors,' meaning that in the atmosphere, these gases contribute to $PM_{2.5}$ formation."[317] Petitioner contends that the 400-well Project will result in significant emissions of $PM_{2.5}$ and $PM_{2.5}$ precursors into the airshed.[318] For example, truck travel will release NO$_X$, VOCs, and $PM_{2.5}$;[319] construction and drilling activities will emit NO$_X$, $SO_2$. VOCs, and $PM_{2.5}$;[320] and the use of compressor stations, heaters, engines and tanks will produce NO$_X$, VOCs and $PM_{2.5}$.[321] Petitioner asserts that the Forest Service, in its near-field analysis, does not determine or otherwise analyze these project-related sources of secondary $PM_{2.5}$ formation and therefore fails to take a hard look at this environmental issue. Petitioner concludes that "[w]ithout analysis of the contribution of the emissions of precursors to overall project $PM_{2.5}$ emissions and concentrations in its near-field analysis, the Forest Service cannot evaluate the possible environmental effects of the proposed project and its alternatives, cannot present these effects to the public, cannot undertake well-informed decision making, cannot derive reasonable mitigation measures and cannot meet its NEPA obligations."[322]

---

[316] Motion at 67; Amended Petitioner ¶¶ 196–197.

[317] Motion at 68; Amended Petition ¶ 198.

[318] Motion at 68.

[319] *Id.* (citing AR61830, AR61840–42, AR61856–57).

[320] *Id.* (citing AR61741 AR61825–28, 34).

[321] *Id.* (citing AR61741, AR61822, AR61838; AR61847, AR61853).

[322] *Id.*

Respondents state that the FEIS addresses secondary $PM_{2.5}$ particulate formation.[323] Respondents point out that "[t]he CALPUFF modeling analysis used algorithms to account for formation of secondary organic aerosol and the conversion of sulfur dioxide to sulfate and nitrogen oxides to nitrate."[324] As for Petitioner's argument that the Forest Service did not determine or analyze project-related sources of secondary $PM_{2.5}$ formation in its near-field analysis Respondents contend that the FEIS demonstrates that the Forest Service took a hard look at that issue.[325] Respondents explain that "at the time the air quality analysis was being conducted, EPA guidance recommended the AERMOD Gaussian Plume and CALPUFF models be used for near-source air quality and far-field air quality impact assessment."[326] But "UDAQ recommended against using the AERMOD model," and "[i]nstead, UDAQ recommended another model, which [the Forest Service] utilized."[327] Respondents state that the Forest Service's reliance on the expert agency's recommended air models is entitled to deference, and Petitioner cannot demonstrate that the Forest Service's use of this recommended model was arbitrary and capricious.[328]

Petitioner replies that "the Forest Service is not able to point to any evidence that it considered secondary particulate formation in its *near-field analysis and modeling* of project impacts on local $PM_{2.5}$ concentrations. Rather, the Forest Service is only able to cite the agency's far-field modeling efforts in Section 4.0."[329] "[T]he fact that the agency did not include the secondary formation of $PM_{2.5}$ in its modeling underscores that the 400-well Project will be even

---

[323] Respondents' Opposition at 73 (citing AR61768).

[324] *Id.*

[325] *Id.* at 73–74.

[326] *Id.* at 73 (citing AR61745).

[327] *Id.*

[328] *Id.* at 73–74.

[329] Reply at 38 (emphasis added).

more certain to cause a violation of the 24-hour $PM_{2.5}$ NAAQS."[330] Finally, Petitioner contends that it does not take issue with the use of the ISCST3 for analyzing near-field impacts."[331] "Rather, it is the failure of the Forest Service to use the ISCST3 to determine the contribution of $PM_{2.5}$ precursors to concentrations of $PM_{2.5}$ in its near-field analysis."[332] Petitioner points out that "DAQ specifically commented in the context of the Forest Service's near-field analysis that 'no . . . consideration of secondary particulate formation in the model is made.'"[333] As for the issue of fine particulate matter, Petitioner contends that "the Forest Service and BLM have not met their duty to minimize impacts to air quality and ensure that the 400-well Project complies with air quality standards[,]"[334] because "[t]he record confirms that air quality in the Basin exceeds the 24-hour $PM_{2.5}$ NAAQS and the 400-well Project will contribute significant emissions of fine particulate matter and PM2.5 precursors to this ailing airshed."[335]

At the January 26, 2016 Motion Hearing, Respondents were asked whether there is evidence of secondary $PM_{2.5}$ formation in the near-field analysis. In response, they stated that "there is no evidence of secondary $PM_{2.5}$ formation in the Near-Field analysis because it's not scientifically accepted practice to do that. That type of analysis is performed in the Far-Field analysis."[336] Respondents state that the record demonstrates that the Forest Service did perform a secondary $PM_{2.5}$ formation analysis in the Far-Field analysis.[337] Petitioner argued, among other

---

[330] *Id.*

[331] *Id.* at 39.

[332] *Id.*

[333] *Id.* (citing AR64696 (in the context of near-field analysis)).

[334] *Id.* at 30.

[335] *Id.* (citing AR61370).

[336] January 26, 2016 Motion Hearing Transcript at 42:20-23.

[337] *Id.* at 42:25-43:1.

things, that Respondents' answer appeared to be post hoc rationalization and it did not recall Respondents making this argument in their Opposition.[338]

"An agency may not unilaterally determine what constitutes the Administrative Record, nor can the agency supplement the Administrative Record submitted to the district court with post hoc rationalizations for its decision[.]"[339] "Because the arbitrary and capricious standard focuses on the rationality of an agency's decision making process rather than on the rationality of the actual decision, '[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.' Thus, the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record. The agency must make plain its course of inquiry, its analysis and its reasoning. After-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the agency with these principles."[340]

This is not a post hoc rationalization issue. Instead, the issue is whether the Forest Service was required to separately address the secondary $PM_{2.5}$ formation in its near-field analysis. Petitioner has not cited to any law or practice to support its position. And the science is disputed. Petitioner's post hoc rationalization argument does not satisfy its burden of establishing that the agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

c. **The Forest Service did not violate the law by failing to take a hard look and approving a project that resulted in violations of the NAAQS and PSD increments**

Petitioner contends that "[d]espite the fact that the 400-well Project will contribute significant air pollution to an airshed out of compliance with the ozone NAAQS, the Forest

---

[338] *Id.* at 45-47.

[339] *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739–40 (10th Cir. 1993) (citation omitted).

[340] *Colorado Wild, Heartwood v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006) (citations omitted).

Service failed to take a hard look at the impacts of the project on ozone concentrations."[341] Specifically, Petitioner argues that the Forest Service failed to take a hard look at both "the direct and cumulative impacts of the project on ozone concentrations and therefore violated NEPA."[342] Petition further argues that "in addition to failing to take the requisite hard look at the consequences of the 400-well Project, the agencies have not met their legal obligation to protect air quality on the Ashley National Forest and in the Uinta Basin."[343]

### i. *Direct or Near-Field Impacts of the Project*

Petitioner argues that the Forest Service failed to take a hard look at the direct impacts of the project because it "refused to undertake a number-based or quantitative examination of the issue and instead relied on a narrative analysis to address the direct or near-field impacts of the project."[344]

The Forest Service, in response, contends that the reason it did not undertake a quantitative examination is because it "determined in consultation with EPA that it was not appropriate to undertake a quantitative modeling analyses of ozone impacts from the Project."[345] The Forest Service explains that

> [o]zone is not directly emitted. It is a secondary pollutant formed when the ozone precursors oxides of nitrogen ("$NO_x$") and volatile organic compounds ("VOCs") combine in the air with sunlight.[346] Because these precursor pollutants can reside in the atmosphere for significant amounts of time and travel over significant distances, ozone impacts are best assessed on a regional scale.[347] Such a large

---

[341] Motion at 75.

[342] *Id.* at 70.

[343] *Id.*

[344] *Id.* at 75 (citing AR61357 (FEIS includes no ozone data); AR61369 ("Ozone impacts from this project are addressed through a qualitative emissions analysis"); AR61375 (no ozone modeling performed for the proposed project); AR61948 (DOI stating qualitative analysis insufficient); AR61950-51 (EPA); AR61949 (EPA noting that actual ozone monitoring should be used in the FEIS); AR63378 (EPA)).

[345] Respondents' Opposition at 30 (citing AR61375).

[346] AR61358–59.

[347] AR61375.

scale modeling analysis was not reasonable for this Project. This is due both to the cost required to undertake such an analysis and because emissions from the Project are unlikely to be noticeable in the model as compared to cumulative contributions.[348] However, because reductions in $NO_x$ and VOC emissions will result in lower levels of ozone being formed, a qualitative analysis was performed for ozone impacts based upon the implementation of emission reducing mitigation measures for the Project.[349]

Berry Petroleum further explains the complicated and costly nature of undertaking a quantitative examination of ozone concentration.[350] Berry Petroleum contends that "[t]he Forest Service appropriately determined that deployment of a costly and complex model adequate to capture the complete reactions that lead to the formation of ozone was not appropriate where, as here, the 'project's contributions are unlikely to be noticeable in the model compared to cumulative contributions.'"[351]

As explained above, for the Forest Service to have violated the hard look requirement, there must be a finding that the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[352] This did not happen here. The Forest Service has provided a reasonable explanation for its decision not to undertake a quantitative examination of the near-field impacts of the project on ozone concentrations. Petitioner has not provided any argument to challenge the Forest Service's explanation. Here, in the context of such technical and scientific matters, judicial deference to the Forest Service's decision must be exercised.[353] Petitioner is unlikely to

---

[348] *Id.*

[349] Respondents' Opposition at 30.

[350] Berry Petroleum's Opposition at 42–43.

[351] *Id.* at 43 (quoting AR61375).

[352] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

[353] *Utah Envt'l. Congress v. Bosworth*, 372 F.3d 1219, 1223 (10th Cir. 2004) (internal citations omitted).

demonstrate that the Forest Service's decision not to undertake a quantitative examination of the near-field impacts of the project was arbitrary or capricious, or contrary to the requirements of NEPA.

### ii.   Cumulative or Far-Field Impacts of the Project

Petitioner contends that the Forest Service failed to take a hard look at the cumulative ozone impacts because "the Forest Service relied on the UBAQS, [Uintah Basin Air Quality Study,] a study the agency itself discredited, as did EPA and DOI."[354] The Forest Service acknowledges that there are shortcomings in the UBAQS,[355] but argues that it "developed a cumulative ozone analysis based on the best currently available, scientifically credible evidence."[356] The Forest Service points out that the FEIS provides a thorough explanation of its decision to use UBAQS.[357] The Petitioner, in reply, does not contradict the Forest Service's statement that its cumulative ozone analysis is based on the best currently available, scientifically credible evidence, nor does Petitioner otherwise show that the use of UBAQS was inadequate for the Forest Service to meet its goal of informed and reasoned decision-making.

Based on the record and the parties' arguments, it appears that the Forest Service took the requisite hard look at the cumulative impacts of ozone concentration by considering the best currently available, scientifically credible evidence, and thus met its goal of informed decision-making. Thus, Petitioner is unlikely to demonstrate that the Forest Service's decision to use UBAQS was arbitrary or capricious, or contrary to the requirements of NEPA.

---

[354] Motion at 69 (citing AR063378; AR061369 (Ozone impacts addressed "by reference to" study of oil and gas development in the Uintah Basin."); AR061948 (DOI questioning use of UBAQS and discrediting cumulative impact analysis); AR061952-53 (EPA)).

[355] Respondents' Opposition at 31.

[356] *Id.* at 31 (citing AR61376–86).

[357] *Id.*

### iii. Obligation to Protect Air Quality

Petitioner contends that "the record confirms that air quality in the Basin exceeds the 24-hour $PM_{2.5}$ NAAQS and the 400-well Project will contribute significant emissions of fine particulate matter and $PM_{2.5}$ precursors to this ailing airshed."[358] Based on the established record the Petitioner argues that the Forest Service and BLM "have not met their legal obligation to protect air quality on the Ashley National Forest and in the Uinta Basin."[359] According to Petitioner, both the Forest Plan and NFMA create an obligation on the Forest Service to protect air quality. Petitioner argues that "[t]he Forest Plan requires the Forest Service to maintain air quality related values,[360] and 'to control and minimize air pollution impacts from land management activities.'"[361] As for the NFMA, it "requires the Forest Service to protect and, where appropriate, improve the quality of . . . air resources."[362] Petitioner concludes that

> the Forest Service must, *inter alia*: 1) minimize air pollution impacts;[363] 2) maintain air quality at a level that protects Forest resources, meets or is below the NAAQS and safeguards PSD increments;[364] 3) minimize effects on surface resources – including air quality;[365] 4) comply with applicable NAAQS and PSD requirements;[366] and 5) prevent the concentration of air pollutants in the Uinta Basin from exceeding the relevant NAAQS.[367]

> Petitioner contends that the BLM must also safeguard air quality by

> 1) ensuring that lease stipulations that reflect additional reasonable measures and restrictions required to comply with the law and minimize adverse impacts to

---

[358] Motion at 71.

[359] *Id.* at 70.

[360] AR000863.

[361] Motion at 47 (citing AR000868).

[362] *Id.* at 48 (citing 16 U.S.C. §1602(5)(C)).

[363] *Id.* (citing Forest Plan; 16 U.S.C. §1604(i); 36 C.F.R. §§ 228.102(e), 228.107(a)(2)).

[364] *Id.* (citing the Forest Plan; 16 U.S.C. §1604(i); 36 C.F.R. §§ 219.27(a)(12), 228.102(e), 228.107(a)(2)).

[365] *Id.* (36 C.F.R. § 228.108(a)).

[366] *Id.* (36 C.F.R. §§ 228.112(c)(1), 228.112(e)).

[367] *Id.* (citing the Clean Air Act, 42 U.S.C. §§ 7473(b)(4), 7418(a)).

resource values;[368] 2) undertake appropriate environmental analysis in order to determine adequate terms and conditions of any APDs;[369] 3) guarantee that operations will be conducted in a manner that protects natural resources and environmental quality;[370] 4) require that operations are carried out according to applicable laws, regulations, lease terms and conditions, and the approved drilling plan or subsequent operations plan;[371] and 5) prevent the maximum allowable concentration of air pollutants in the Uinta Basin from exceeding the relevant NAAQS.[372]

Respondents, in return, argue that the Clean Air Act ("CAA") "establishes a comprehensive program for controlling and improving the nation's air quality through a combination of state and federal regulations."[373] The CAA does not require the Forest Service or the BLM to ensure that the NAAQs and PSD increments are achieved or that they are not exceeded.[374] Respondents assert that although "the CAA requires that States develop [State Implementation Plans] SIPs to ensure that the NAAQS are attained and maintained . . . . [F]ederal agencies like USFS and BLM must comply with air pollution control requirements only 'in the same manner, and to the same extent as any nongovernmental entity.'"[375] Thus, because private parties are not required to ensure that the NAAQs are achieved or that they are not exceeded, then the Forest Service or the BLM are not as well. Respondents state that Petitioner's attempt to create a legal obligation upon the Forest Service and the BLM to "prevent the maximum allowable concentrations of air pollutants in the Uinta Basin from exceeding the

---

[368] *Id.* (citing 43 C.F.R. §§ 3101.1-2, 3161.2).

[369] *Id.* (citing 43 C.F.R. §§ 3162.5-1(a), 3161.2).

[370] *Id.*

[371] *Id.*

[372] *Id.* (citing 42 U.S.C. §§ 7473(b)(4), 7418(a)).

[373] Respondents' Opposition at 7.

[374] *Id.* at 63.

[375] *Id.* (citing 42 U.S.C. § 7410(a)(1); 42 U.S.C. § 7418(a); *U.S. v. S. Coast Air Quality Mgmt. Dist.*, 748 F. Supp. 732, 740-41 (C.D. Ca. 1990) (federal agencies are to comply in same manner as private entities)).

relevant NAAQS" must be rejected.[376] Respondents reiterate that "federal agencies like USFS and BLM are subject to air pollution control requirements to the same extent that a private party is subject to such requirements."[377] "Thus, under the CAA, [the Forest Service] and BLM are '*regulated* entities in the same manner and to the same extent as private parties, and contrary to Petitioner's argument, they are not required to step into the permitting authorities' shoes and determine which sources may operate.'"[378]

Berry Petroleum, in opposition, argues that Petitioner "relies on a mischaracterization of relevant statutory and regulatory text, which simply require the Forest Service to develop Forest Plans designed to ensure the 'development and maintenance' of National Forests,[379] and ensure that leasing decisions in the National Forest System comply with NEPA and are 'consistent with' the Forest Plan . . . ."[380] According to Berry Petroleum, the statutory and regulatory text cited by Petitioner "do not impose any substantive obligation on the Forest Service to maintain or improve air quality."[381] As for Petitioner's argument that the Forest Plan creates certain legal obligations for the Forest Service to protect air quality, Berry Petroleum contends that those are general air quality provisions but are not substantive in nature.[382] Thus, contrary to the Petitioner's assertions, "these provisions neither require that the Forest Service 'minimize air

---

[376] *Id.*

[377] *Id.* at 65 (citing 42 U.S.C. § 7418(a)).

[378] *Id.* at 65–66, n. 44 ("To the extent any permits may be required with respect to air emission sources associated with the Project, the owner or operator of the source (*i.e.*, Berry or Linn) would be responsible for obtaining such permits and complying with their terms." *See, e.g., United Steelworkers of Am. v. Oregon Steel Mills*, 322 F.3d 1222, 1228-29 & n.4 (10th Cir. 2003). "USFS and BLM would not be responsible for doing so." *See id.*).

[379] 16 U.S.C § 1604.

[380] Berry Petroleum's Opposition at 37 (citing 36 C.F.R. §§ 228.102(e) (requiring the Forest Service to review BLM oil and gas leasing decisions to ensure compliance with NEPA and consistency with the Forest Plan), 228.107(a)(2) (same)).

[381] *Id.* at 37–38 (citing *Nat'l Res. Defense Council v. Vilsak*, No. 08-cv-02371, 2011 WL 3471011, at *10-11 (D. Colo. Aug. 5, 2011) (Forest Service's finding "that cumulative visibility effects would exceed the voluntarily set figure of 1.0 deciviews does not by itself make approval of the Project inconsistent with the Forest Plan.")).

[382] *Id.* at 38.

pollution impacts,' nor do they impose any obligation on the Forest Service to ensure compliance with NAAQS or PSD increments."[383] "Rather, as noted in the same Forest Plan provisions on which [Petitioner] relies, the Forest Service can review impacts on Air Quality Related Values and coordinate with the state agencies with responsibility for air quality to provide comment on permitting actions."[384] Berry Petroleum underscores that "[n]either NFMA nor NEPA, however, contemplate that the Forest Service step into the shoes of the permitting authority."[385]

Petitioner's Reply Memorandum does not address Respondents' and Berry Petroleum's arguments that the CAA does not impose any substantive obligation on either the Forest Service or the BLM to maintain or improve air quality.[386]

In its briefing as well as during oral argument at the January 26, 2016 Motion Hearing, Petitioner cites to several sources[387] in support of its contention that the Forest Service and BLM have a legal obligation to protect and improve air quality. However, when asked whether there are statutes that require compliance with maintenance of or improvement of air quality in the forest, Petitioner confirms that there are none.[388] Petitioner's cited sources appear to be aspirational goals and objects, the sources do not appear to impose an affirmative obligation on the Forest Service or the BLM to protect or improve air quality, apart from their obligation to comply with state developed air pollution control requirements. Accordingly, Petitioner is

---

[383] *Id.*

[384] *Id.*

[385] *Id.* (citing *Davis v. Slater*, 148 F. Supp. 2d 1195, 1214 (D. Utah 2001), *rev'd on other grounds sub nom. Davis*, 302 F.3d 1104 ("[I]t is entirely reasonable, when evaluating the possible environmental impacts of a project, for an agency to assume necessary compliance with permitting standards regarding permits which the project must have in order to go forward."). *See also TOMAC v. Norton*, 433 F.3d 852, 863 (D.C. Cir. 2006) ("The CAA, and not NEPA, is the primary force guiding states and localities into NAAQS compliance.")).

[386] Reply at 30.

[387] Petitioner cites, inter alia, to the following sources: AR627-28; AR863; AR868-69; 16 U.S.C. § 1602(5)(C); 36 C.F.R 219.27; 43 C.F.R.2920.7(b)(3); 2011 Memorandum of Understanding.

[388] January 26, 2016 Motion Hearing Transcript 52:14-17.

unlikely to demonstrate that the Forest Service or BLM acted in an arbitrary or capricious manner on this issue.

### d. The analysis of truck trips is supported by the record and does not fall short of NEPA

Petitioner contends that the Forest Service failed to take a hard look at the environmental impacts that truck traffic will cause the area. Petitioner bases this conclusion on several arguments. First, Petitioner argues that the Forest Service was wrong in narrowing its consideration of vehicle trips to only "off-pavement" truck trips and estimating the average roundtrip length of each of these trips to only 20 miles.[389] Petitioner argues that "there is absolutely nothing in the record to support" the 20 miles estimate.[390] "It is not based on any analysis of the actual project road system, which consists of at least 77 miles of new and upgraded dirt roads, . . . and an unspecified number of miles of existing roads."[391] And "the Forest Service cannot defend its prediction that each roundtrip will be 20 miles."[392] Petitioner contends that the 20 mile estimate, for purposes of air quality analysis, does not take into consideration truck emissions or fugitive dust created by the passage of trucks on dirt roads anywhere outside the Project Area. Petitioner states that the mileage estimates and the decision to limit the analysis of truck travel to the Project Area cannot be sustained because trucks outside of the Project Area "will be on dirt roads that are not subject to dust abatement and therefore will be generating something like 488 tons per year of $PM_{10}$ and 48 tons per year of $PM_{2.5}$ and still

---

[389] Motion at 71.

[390] *Id.* at 72.

[391] *Id.*

[392] *Id.*

the Forest Service somehow maintains that this off-Project Area dust will have no environmental impacts."[393]

Petitioner next argues that the Forest Service has failed to address the consequences of the workover rigs for emergency repairs on the estimated truck trips.[394] According to Petitioner, "[t]he issue of workover rigs has taken on added import because, in the name of emergency repairs, the Operator is continually violating seasonal restrictions in place to protect wildlife, including sage-grouse."[395] Petitioner concludes that "although workovers and recompletions promised to have significant adverse impacts . . . the Forest Service refused to address the consequences of seven days of truck traffic per well per year for the decades during which this maintenance is required."[396]

Petitioner also takes issue with the data on which the air quality analysis is based. Petitioner states that the air quality analysis underestimates the impacts of construction activities and associated truck traffic on air quality because of the pace of development.[397] That is, although "the modeling that purports to predict the air quality impact of the project 'assumes . . . 400 wells would be constructed at an even pace of 20 wells per year for 20 years[,] . . . . [T]he Forest Service ultimately approved an accelerated project timeline, allowing the operator to drill up to 40 wells per year."[398] Petitioner also points out that "the air quality analysis fails to estimate the emission impacts of waste water or 'produced water.'"[399] Petitioner argues that 70%

---

[393] *Id.* at 73.

[394] *Id.* at 74.

[395] *Id.*

[396] *Id.* (citing AR64275; AR64266-67).

[397] *Id.*

[398] *Id.* (citing AR61369; AR61817; AR62054).

[399] *Id.* at 75.

of 'produced water' will be reused, and 30% will be sent to a disposal facility.[400] "Yet, 'truck traffic estimates' do not include a prediction of the number of truck trips associated with the transport of produced water to disposal sites."[401]

Petitioner's final point is that "the emission estimates also fails to account for trucks used in the process of applying water to roads to reduce dust."[402] "According to EPA, to achieve the 50% dust control the models assume, roads must be watered twice a day, 303 days a year."[403] "Yet, there is no calculation of the emissions that will result from trucks that must drive the length of every road in the Project-Area twice a day, most days of the year for decades."[404]

Respondents contend that "Petitioner's arguments arise from a misunderstanding of [the Forest Service's] air quality analysis and fly-specking the FEIS. The Record demonstrates that [the Forest Service] adequately analyzed the potential environmental consequences of truck trips from the Project."[405] Regarding the 20 mile round trip number, Respondent states that the 20-mile calculation is an average estimate for truck trips.[406] Respondent states that "'[e]missions associated with vehicle traffic were calculated using the average distance a vehicle would have to travel once they entered the production field.'"[407] "This was determined by 'taking the shortest and longest road segments in the production modeling scenario and taking an arithmetic average of the two. This distance was then doubled to determine the round trip vehicle miles traveled."[408]

---

[400] *Id.*

[401] *Id.*

[402] *Id.*

[403] *Id*. (AR63379).

[404] *Id.* at 75.

[405] Respondents' Opposition at 74.

[406] *Id.*

[407] *Id.* (citing AR61753).

[408] Respondents' Opposition at 74.

Respondent contends that "Petitioner fails to point to any record evidence calling into question this analysis, which is entitled to deference."[409] Respondent next argues that although there are 77 miles of roads, Petitioner is incorrect to assume that every mile of road within the Project area will be traveled by every truck over the entire life of the Project.[410] Respondents further support their 20 mile average by arguing that not all 356 potential wells authorized by the ROD may be drilled, and not all will be in production simultaneously at any time. Water trucks will not operate at all times or at all seasons, and drilling operations are prohibited from November 15 through April 30.

As for limiting truck trips to the Project area, Respondents state that the FEIS's far-field cumulative air analysis analyzed vehicle travel on paved and unpaved roads in the wider region.[411] Respondents point out that "[t]ruck traffic including trips to transport oil outside of the Project area, were included in the dispersion modeling analysis."[412] Respondents assert that "agencies are entitled to deference in their choice of analysis area for determining the potential effects of the Project."[413]

Respondents next address Petitioner's argument that the FEIS failed to take a hard look at potential impacts of fugitive dust from truck trips.[414] Respondents cite to record evidence and argue that the evidence shows that the Forest Service analyzed and disclosed potential

---

[409] *Id.*

[410] *Id.* at 75.

[411] *Id.*

[412] *Id.* at 75–76 (citing AR61751-53; 61821).

[413] *Id.* at 76. *San Juan Citizens Alliance v. Stiles*, 654 F.3d 1038, 1057 (10th Cir. 2011) (holding that identification of the geographic area within which cumulative effects may occur is a task assigned to the special competency of the agency).

[414] Respondents' Opposition at 76.

environmental consequences from fugitive dust, and therefore satisfied NEPA.[415] As for routine

workovers and recompletions, Respondents cite record evidence and state that the FEIS

addresses truck traffic related to workovers and recompletions.[416] Respondents conclude that the

"[r]ecord clearly demonstrates that [the Forest Service] properly analyzed the impacts from

fugitive dust from truck traffic. Petitioner's claim is not supported by the record and is not likely

to succeed on the merits."[417] Petitioner, in reply, essentially re-states the same arguments raised

in its Motion.[418]

        As previously stated, "NEPA requires no substantive result."[419] Rather, "NEPA imposes

procedural, information-gathering requirements on an agency, but is silent about the course of

action the agency should take."[420] Thus, under NEPA, the Forest Service's obligation is to take a

"hard look" at information relevant to its factual determination. The record shows that the Forest

Service reasonably considered the environmental impacts that truck traffic will cause the area.

Regarding the 20 mile average roundtrip length, the record shows how the Forest Service took

into consideration the relevant factors in determining this was an appropriate measurement. The

FEIS explains that "[e]missions associated with vehicle traffic were calculated using the average

---

[415] *Id.* (citing AR61574 (other impacts from transportation include fugitive dust); AR61327 (analysis of proposed alternative regarding fugitive dust); AR61582 (describing impacts from fugitive dust); AR61585 (same); AR61831-33 (construction fugitive dust assumptions); AR61842 (emissions data from road traffic installing production equipment); AR61846 (compressor station construction road traffic emissions data); AR61361 (existing sources of air pollution). The Forest Service also disclosed the potential impacts from fugitive dust on other resources. *See*, *e.g.*, AR61446-47 (vegetation); AR61496 (elk habitat)).

[416] *Id.* at 77 (citing AR61475; AR61480; AR61489; AR61498; AR61515. *See also* AR14697 (Project biological evaluation); AR14702 (same); AR14777 (Project management indicator species report); AR14795 (same); AR14800 (same); AR64266-67 (Project administrative appeal response); AR64275 (same)).

[417] Respondents' Opposition at 78.

[418] Reply at 30–34.

[419] *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Engineers*, 702 F.3d 1156, 1166 (10th Cir. 2012).

[420] *Id.*

distance a vehicle would have to travel once they entered the production field."[421] This calculation was determined by "taking the shortest and longest road segments in the production modeling scenario and taking an arithmetic average of the two. This distance was then doubled to determine the round trip vehicle miles travel[led]."[422] The record reflects that truck trip estimates were also provided by the Operator, Berry Petroleum.[423] Although the project road system consists of at least 77 miles, the Forest Service provides a reasonable basis for not using all 77 miles in its estimate—that is, not every mile of road will be traveled by every truck over the entire life of the Project. Although Petitioner takes issue with this estimate, and provides its own methodology for how to calculate truck trips, this does not render the Forest Service's reasoned evaluation of the available information and its own methodology arbitrary or capricious. "Courts are not in a position to decide the propriety of competing methodologies . . . but instead, should determine simply whether the challenged method had a rational basis and took into consideration the relevant factors."[424]

As for limiting the analysis of truck travel to the Project Area, the record reflects that the Forest Service analyzed in its far-field cumulative air analysis the emissions from vehicles traveling on paved and unpaved roads in the wider region.[425] Furthermore, truck traffic was included in the FEIS's dispersion modeling analysis.[426] Ultimately, "the 'determination of the extent and effect of [cumulative environmental impacts], and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the

---

[421] AR61753.

[422] *Id.*

[423] AR61835.

[424] *Silverton Snowmobile Club v. U.S. Forest Service,* 433 F.3d 772, 782 (10th Cir. 2006) (internal quotation and citation omitted).

[425]  *See  generally,* AR61373; AR6137–39; AR61369.

[426] AR61751–53; AR61821.

appropriate agencies.'"[427] Petitioner is unlikely to demonstrate that the Forest Service failed to

consider the relevant factors and that its decision to limit its analysis of truck travel to the Project

Area was arbitrary or capricious. Regarding Petitioner's argument that the FEIS failed to take a

hard look at potential impacts of fugitive dust from truck trips, the record reflects that the Forest

Service considered this issue.[428]

During the January 26, 2016 Motion Hearing, Respondents were asked questions on the

remaining issues raised by Petitioner. Specifically, they were asked whether the air quality

analysis in the FEIS addressed impacts associated with truck traffic related to workover and

recompletion of rigs. Respondents stated that the analysis did not separately consider workover

rigs, but provided a thorough explanation of how the Forest Service took a hard look at the

overall truck travel estimates for the life of the project.[429] Petitioner replied that "none of this

explanation was made in that [*sic*] response. So that would suggest . . . it's post hoc

rationalization for a decision that was already made."[430] Similar to Petitioner's failed post hoc

rationalization argument above, this is also not a post hoc rationalization issue. Instead, the issue

here comes down to whether Respondents were required to separately analyze recompletion or

workover rigs as an independent category or whether it was sufficient for Respondents to

estimate the daily truck travel for the life of the project, which included travel for recompletion

or workover rigs. Petitioner has failed to cite any law or practice to supports its position nor to

---

[427] *San Juan Citizens Alliance v. Stiles*, 654 F.3d 1038, 1057 (10th Cir. 2011) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976)).

[428] Regarding fugitive dust, s*ee*, *e.g.* AR61574 (other impacts from transportation include fugitive dust); AR61327 (analysis of proposed alternative regarding fugitive dust); AR61582 (describing impacts from fugitive dust); AR61585 (same); AR61831-33 (construction fugitive dust assumptions); AR61842 (emissions data from road traffic installing production equipment); AR61846 (compressor station construction road traffic emissions data); AR61361 (existing sources of air pollution). USFS also disclosed the potential impacts from fugitive dust on other resources. *See*, *e.g.*, AR61446-47 (vegetation); AR61496 (elk habitat).

[429] January 26, 2016 Motion Hearing Transcript 75:15-82:17.

[430] *Id.* at 82:21-23.

challenge the Forest Service's explanation. Petitioner's post hoc rationalization argument does not satisfy its burden of establishing that the agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

### 4. The Forest Service Did Not Fail To Take A Hard Look At The Impact Of The Project On Water Quality And Did Not Violate NEPA By Failing To Ensure That Water Quality Standards Will Be Met

Petitioner argues that Respondents have an obligation to take a hard look at the impact of the project on water quality and "[t]he Forest Service must also establish that its actions are consistent with Utah Water Quality Standards."[431] Petitioner contends that the Forest Service has failed to ensure that its actions are consistent with Utah Water Quality Standards.[432] Petitioner concludes that "although water quality in the Project Area is not meeting Utah Water Quality Standards and the Forest Service admits that the 400-well Project will further impair water quality . . . the agency simply authorizes the project and continues to implement[] its site-specific components."[433] "By thus neglecting the obligation to address and prevent further degradation of water quality and to bring Antelope Creek into conformance with state standards, the Forest Service and BLM have violated NEPA and their substantive obligations to protect water quality and comply with Utah Water Quality Standards."[434]

Respondents contend that the record demonstrates that the FEIS took a hard look at the potential impacts.[435] Respondents cite several parts of the record in support of their position that the FEIS took a hard look at the potential impacts.[436]  For example, "[t]he FEIS discloses the

---

[431] Motion at 75 (citing e.g. 33 U.S.C. §§ 1323(a), 1323(a)(2); 36 C.F.R § 219.1).

[432] Id. at 76.

[433] Id.

[434] Id. at 77.

[435] Respondents' Opposition at 78.

[436] Id. (citing AR61424-32 (FEIS hydrology analysis); AR2799-825 (hydrology specialist's report); AR61418-22 (disclosure of water quality impairments designated by Utah DWQ); AR61428-30 (surface water mitigation and

current TDS standard of 1,200 mg/L, as well as site-specific criteria recommended by the State

of Utah for Antelope Creek."[437] "The FEIS also discloses potential impacts to surface and

groundwater."[438] And "[t]he FEIS and ROD also include mitigation measures and operational

requirements developed to avoid or minimize potential impacts."[439]

Regarding the Forest Service's obligation to establish that its actions are consistent with

Utah Water Quality Standards, Respondents argue that "Petitioner improperly attempts to

conflate NEPA's procedural requirements with the substantive obligations of the CWA."[440]

Respondents point out that the section that Petitioner relies on, 40 C.F.R. § 1508.27(b),

"discusses how agencies may determine whether a project will significantly affect the

environment by considering context and intensity to determine whether preparation of an EIS is

necessary."[441] "It does not mandate that agencies establish their actions are consistent with state

water quality standards."[442]

Petitioner, in reply, essentially re-states the same arguments raised in its Motion and does

not address Respondents' arguments that the CWA does not impose any substantive obligation

on either the Forest Service or the BLM to maintain or improve water quality.[443] During the

January 26, 2016 Motion Hearing, Petitioner was asked whether there is any statute that imposed

a substantive obligation on the Forest Service to ensure that its actions are consistent with Utah

---

BMPs); AR62075-79 (mitigation in ROD); AR61430-32 (groundwater resources in the Project area and groundwater mitigation reflected in onshore orders)).

[437] *Id.* at 79 (citing AR61419–20).

[438] *Id.* (citing AR61424–48).

[439] *Id.* (citing AR61428–34; AR62077–79).

[440] *Id.* at 78.

[441] *Id.* at 79.

[442] *Id.*

[443] Reply at 39–40.

Water Quality Standards. Petitioner responded that its issue on this matter is "narrow."[444] Essentially, Petitioner's argument is that the Forest Service and the BLM, relying on the state's recommendation that it would procure an exemption allowing a higher site specific water quality standard, failed to explain whether their actions would comply with water quality standards.[445] Petitioner argues that the state never made this recommendation, and "[s]o the Forest Service was in a position of relying on something that didn't happen."[446]

Limited to this narrow issue, Petitioner's argument lacks merit. Based on the record and the parties' arguments during the January 26, 2016 Motion Hearing, it appears that the Forest Service took the requisite hard look at UDAQ's TMDL requirements and the prescribed best management practices ("BMPs"), and imposed in the ROD several BMPs and mitigation measures.[447] Respondents took the requisite hard look at the potential impacts on water quality regardless of the state's exemption recommendation.

---

[444] January 26, 2016 Motion Hearing at 73:10-11.

[445] *Id.* at 73:12-74:6.

[446] *Id.* at 73:25-74:1.

[447] *See e.g.* Respondents' Opposition at 67-69; AR62075-79; AR61525.