IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| WILDEARTH GUARDIANS,<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES FOREST SERVICE;<br>UNITED STATES BUREAU OF LAND<br>MANAGEMENT; JOHN R. ERICKSON,<br>in his official capacity as Forest Supervisor,<br>Ashley National Forest; JUAN PALMA, in<br>his official capacity as State Director of the<br>Bureau of Land Management Utah State<br>Office; MIKE STIEWIG, in his official<br>capacity as Field Office Manager of Bureau<br>of Land Management Vernal Field Office,<br><br>Defendants,<br><br>and<br><br>BERRY PETROLEUM COMPANY, LLC,<br><br>Intervenor. | **MEMORANDUM DECISION AND**<br>**ORDER ON THE MERITS**<br><br><br><br>Case No. 2:14-cv-00349-DN<br><br>District Judge David Nuffer |

Petitioner WildEarth Guardians ("WildEarth") brought this action against Respondents

U.S. Bureau of Land Management ("BLM"), U.S. Forest Service, and specified individual

officers (collectively, the "Agencies") for judicial review under the Administrative Procedure Act

("APA")[1] of certain decisions that the Agencies made regarding an oil and gas development

---

[1] 5 U.S.C. §§ 701-706.

project on public lands leased to Intervenor Berry Petroleum Company LLC ("Berry") within the South Unit of the Ashley National Forest ("ANF") in Duchesne County, Utah.[2]

The APA generally entitles a person who suffers a "legal wrong because of agency action," or who is "adversely affected or aggrieved by agency action," to judicial review of the agency action.[3] Agency action will not be set aside under the APA unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[4] Agency action will be deemed arbitrary and capricious "if the agency . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[5] Agency action may also be considered arbitrary and capricious if it was not "based on consideration of the relevant factors" or "there has been a clear error of judgment."[6]

Because the agency action that WildEarth challenges in this case is not arbitrary, capricious, or contrary to law, WildEarth's request for relief is DENIED.

---

[2] *See* Amended Petition for Review of Agency Action and Complaint for Injunctive and Declaratory Relief ("Amended Petition"), docket no. 3, filed May 14, 2014; *see also* Altered Opening Brief of Petitioner ("AOB"), docket no. 92, filed June 26, 2015; Opposition to WildEarth Guardians' Altered Opening Brief ("Berry's Opposition"), docket no. 118, filed Sept. 7, 2016; Federal Respondents' Opposition to Petitioner's Altered Merits Brief ("Agencies' Opposition"), docket no. 119, filed Sept. 7, 2016; Reply Brief of Petitioner WildEarth Guardians ("Reply"), docket no. 121, filed Sept. 28, 2016; Federal Respondents' Sur-Reply to Reply Brief of Petitioner ("Agencies' Sur-Reply"), docket no. 133, filed July 9, 2018; Berry Petroleum Company LLC's Sur-Reply to Petitioner's Reply Brief ("Berry's Sur-Reply"), docket no. 135, filed July 11, 2018.

[3] 5 U.S.C. § 702; *see id.* § 704. "'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]" *Id.* § 551(13).

[4] *Id.* § 706(2)(A).

[5] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[6] *Utah Envt'l Cong. v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006).

## TABLE OF CONTENTS

Background ..........................................................................................................................3

Discussion ..........................................................................................................................8

I.       The Agencies adequately assessed the Project's impact on sage grouse. ...........8

         A.       The Agencies did not violate NEPA with respect to the NTT
                  Report. ...........................................................................................8

                  1.       The Agencies took a "hard look" at the impacts of the
                           Project. ...................................................................................8

                  2.       The Agencies considered and discussed a sufficient range
                           of alternatives. .....................................................................11

                  3.       The Agencies were not required to supplement their NEPA
                           analysis. ...............................................................................13

         B.       The Agencies did not violate NFMA with respect to the NTT
                  Report. .........................................................................................15

II.      The Agencies adequately assessed the Project's impact on inventoried
         roadless areas. .......................................................................................16

         A.       The Agencies did not violate NEPA with respect to IRAs. ...............17

         B.       The Agencies did not violate the Roadless Rule. ............................18

III.     The Agencies adequately assessed the Project's impact on air quality. ...........20

         A.       The Agencies did not violate NEPA with respect to air quality. ...........20

                  1.       The Agencies properly supported and explained their
                           decision regarding background concentration data. ...................20

                  2.       The Agencies took a "hard look" at the impact of secondary
                           $PM_{2.5}$ formation. ...........................................................................21

                  3.       The Agencies took a "hard look" at the Project's impact on
                           ozone concentrations. ...........................................................22

                  4.       The Agencies took a "hard look" at the impact of truck
                           traffic and related activities. .................................................22

IV.      The Agencies adequately assessed the Project's impact on water quality. ........25

Order ....................................................................................................................26

## BACKGROUND

The BLM is an agency within the U.S. Department of the Interior responsible for leasing

oil, gas, and other mineral deposits on federal lands in accordance with applicable laws,

including the Mineral Leasing Act ("MLA"),[7] the Federal Onshore Oil and Gas Leasing Reform

---

[7] 30 U.S.C. § 181 et seq.; *see* 30 U.S.C. § 226(a).

Act ("Reform Act"),[8] and the National Environmental Policy Act ("NEPA").[9] The Forest Service, which is an agency of the U.S. Department of Agriculture, shares this responsibility with respect to any lease on national forest system lands.[10] The BLM and Forest Service also share responsibility for regulating "surface-disturbing activities conducted pursuant to any lease" on national forest lands.[11]

Before any surface-disturbing activity may be conducted under an oil and gas lease on national forest lands, an operator must submit to the BLM a proposed surface use plan of operations ("SUPO") covering the proposed activity as part of an application for a permit to drill ("APD"), and the Forest Service must analyze and approve the SUPO.[12] As part of its review of a SUPO, the Forest Service must ensure, among other things, that proposed operations will be conducted "in a manner that minimizes effects on surface resources" and "prevents unnecessary or unreasonable surface resource disturbance."[13] The Forest Service must also ensure that the SUPO is consistent with applicable federal laws (such as the Clean Air Act ("CAA")[14] and Clean Water Act ("CWA")),[15] the lease, and—"[t]o the extent consistent with the rights conveyed by the lease"—the applicable forest plan.[16] A forest plan is required under the National Forest

---

[8] Pub. L. No. 100-203, 101 Stat. 1330-256 (1987).

[9] 42 U.S.C. § 4321 et seq.

[10] *See* 30 U.S.C. § 226(h); 43 C.F.R. §§ 3101.7-1(c), 3101.7-2.

[11] 30 U.S.C. § 226(g).

[12] 36 C.F.R. §§ 228.106(a), 228.107.

[13] 36 C.F.R. § 228.107(a), 228.108(a).

[14] 42 U.S.C. § 7401 et seq.; *see* 36 C.F.R. § 228.112(c).

[15] 33 U.S.C. § 1251 et seq. The CWA is also known as the Federal Water Pollution Control Act.

[16] 36 C.F.R. § 228.107(a). "Forest plan" is short for "forest land and resource management plan."

Management Act ("NFMA")[17] for each unit of the national forest system.[18] "[P]ermits, contracts, and other instruments for the use and occupancy of National Forest System lands" must be consistent with the applicable forest plan, "subject to valid existing rights."[19]

If the Forest Service approves a SUPO for an oil and gas lease, the BLM may thereafter approve the corresponding APD.[20] Before approving an APD, the BLM must prepare an environmental assessment ("EA")[21] to be used in determining whether an environmental impact statement ("EIS")[22] is required under NEPA.[23] An EIS is required for all "major Federal actions significantly affecting the quality of the human environment."[24] An EIS must "provide full and fair discussion of significant environmental impacts and . . . inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."[25] An agency must prepare a supplement to an EIS if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[26]

Based on an EIS, public comments, and other available information, the Forest Service decided in 1997 to make certain lands within the ANF available for future oil and gas leases

---

[17] Pub. L. No. 94-588, 90 Stat. 2949 (1976); *see* 16 U.S.C. § 1600 et seq.

[18] 16 U.S.C. § 1604.

[19] *Id.* § 1604(i).

[20] 43 C.F.R. § 3162.3-1(h).

[21] *See* 40 C.F.R. § 1508.9 (explaining what an EA is).

[22] *See id.* § 1508.11 (explaining what an EIS is).

[23] 43 C.F.R. § 3162.5-1(a).

[24] 42 U.S.C. § 4332(C); *see* 40 C.F.R. §§ 1501.4, 1502.3. A major federal action includes a significant project regulated or approved by federal agencies, such as construction activities approved by permit or other regulatory decision in a defined geographic area. *See* 40 C.F.R. § 1508.18.

[25] 40 C.F.R. § 1502.1.

[26] *Id.* § 1502.9(c)(1)(ii).

subject to certain stipulations.[27] As part of this decision, the Forest Service amended ANF's forest plan (the "Forest Plan").[28] The following year, the BLM and Forest Service issued oil and gas leases for certain areas (the "Leased Area") in the South Unit of the ANF to Berry.[29] In 2007, Berry submitted a master development plan ("MDP") to the Forest Service for the proposed construction of up to 400 new oil and gas wells and related structures within the Leased Area (the "Project").[30]

Over the next several years, the Forest Service analyzed the proposed MDP and a range of alternative proposals for the Project, including three action alternatives and a no-action alternative.[31] In 2007, the Forest Service published a notice of intent to prepare an EIS[32] and solicited public comments regarding the EIS's scope.[33] In 2010, the Forest Service issued a draft EIS and offered a 60-day public comment period.[34] In February 2012, the Forest Service issued a final EIS ("FEIS").[35] Based on the FEIS, the Forest Service issued a record of decision ("ROD")

---

[27] Record of Decision: Western Uinta Basin Oil and Gas Leasing, FSAR 001376, dated Sept. 1997 (another copy is at FSAR 064221); *see* Final Environmental Impact Statement: Western Uinta Basin Oil and Gas Leasing, FSAR 064171, dated Sept. 1997. The prefix "FSAR" is added to record citations for reference purposes consistent with the Declaration of Kathleen M. Paulin Certifying the Administrative Record, docket no. 42-1, filed Oct. 31, 2014.

[28] Record of Decision, *supra* note 27, at FSAR 001377; *see* Land and Resource Management Plan ("Forest Plan"), FSAR 000775, adopted Oct. 8, 1986.

[29] Amended Petition, *supra* note 2, ¶ 90. In December 2013, Berry merged with Linn Energy LLC. AOB, *supra* note 2, at 1 n.1. All references to Berry in this Memorandum Decision and Order, except in the context of pre-December 2013 activities, include Linn Energy LLC.

[30] Full Field Oil and Gas Exploration and Development Project Master Development Plan: Ashley National Forest, South Unit ("MDP"), FSAR 001528, dated Jan. 18, 2007.

[31] *See* Record of Decision: South Unit Oil and Gas Development Final Environmental Impact Statement ("ROD"), FSAR 062048, at FSAR 062059, dated Feb. 2012.

[32] Notice, FSAR 001925, dated Aug. 29, 2007.

[33] Notice, FSAR 001554, dated Sept. 5, 2007.

[34] 1 Draft Environmental Impact Statement, FSAR 060147, dated Feb. 2010; 2 Draft Environmental Impact Statement, FSAR 060484, dated Feb. 2010.

[35] 1 Final Environmental Impact Statement, FSAR 061282 ("1 FEIS"), dated Feb. 2012; 2 Final Environmental Impact Statement ("2 FEIS"), FSAR 061675, dated Feb. 2010.

rejecting the MDP's proposal for the Project and selecting a modified version of one of the alternatives considered in the FEIS (the "Selected Alternative").[36]

The Selected Alternative incorporates various measures to minimize and mitigate surface and environmental impacts associated with the Project.[37] It divides implementation of the Project into three phases (A, B, and C) to ensure "meaningful opportunities to consider new knowledge that may be developed over the life of the project."[38] The phases are designed "to defer the majority of development in sensitive portions of the project area (sage grouse habitat, Inventoried Roadless Areas, and crucial big game summer range . . . ) until later," "while still giving [Berry] access to areas with a high probability of economic quantities of oil and gas in Phase A."[39] Although the Selected Alternative provides the operating framework for oil and gas development in the Lease Area, it does not authorize the performance of surface-disturbing activities.[40] Before any surface-disturbing activity may occur, Berry must submit and receive approval of a SUPO and APD for each well.[41]

After the ROD was issued, Utah Environmental Congress—which later merged into WildEarth—filed an administrative appeal to the regional forester.[42] On May 23, 2012, the regional forester affirmed the ROD.[43] On May 7, 2014, WildEarth commenced this action for

---

[36] ROD, *supra* note 31. The Selected Alternative is a modified version of the FEIS's "Alternative 4." *See id.* at FSAR 062054.

[37] *See id.* at FSAR 062054-56, 062072-82.

[38] *Id.* at FSAR 062057.

[39] *Id.*

[40] *See id.* at FSAR 062069.

[41] *See id.*; Amended Petition, *supra* note 2, ¶ 95.

[42] *See* Appeal, FSAR 063381, dated Apr. 16, 2012; *see also* Amended Petition, *supra* note 2, ¶ 10.

[43] Decision on Appeal, FSAR 064285, dated May 23, 2012.

judicial review of the ROD and any approved APD within the Leased Area.[44] As of May 14,

2014, the BLM had approved 79 APDs in the Leased Area.[45]

## DISCUSSION

### I.   The Agencies adequately assessed the Project's impact on sage grouse.

The greater sage grouse is considered a Forest Service "sensitive species."[46] In December

2011, the Sage-Grouse National Technical Team—which was composed of state and federal

scientists, including specialists from the BLM and Forest Service—issued a report (the "NTT

Report") with recommendations for the BLM's region-wide land management planning process

for sage grouse.[47] WildEarth contends that the Agencies violated NEPA and the NFMA because

they did not consider or address the NTT Report in relation to the Project.[48]

### A.   The Agencies did not violate NEPA with respect to the NTT Report.

1.   *The Agencies took a "hard look" at the impacts of the Project.*

WildEarth asserts that "the NTT Report specifically discredits the key measures the

Forest Service adopted to avoid or minimize the adverse impacts of the 400-well Project on sage-

grouse and to demonstrate compliance with its regulatory duties."[49] According to WildEarth,

differences between the ROD's mitigation measures and the NTT Report's recommendations

---

[44] *See* Amended Petition, *supra* note 2.

[45] *See* Declaration Certifying Administrative Record, docket no. 42, filed Oct. 31, 2014.

[46] *See* 1 FEIS, *supra* note 35, at FSAR 061469.

[47] A Report on National Greater Sage-Grouse Conservation Measures ("NTT Report"), FSAR 065516, dated Dec. 21, 2011 (another copy is at FSAR 063489).

[48] *See* AOB, *supra* note 2, at 12-26; Amended Petition, *supra* note 2, ¶ 5.

[49] *Id.* at 16.

show that the Forest Service violated NEPA "by failing to take a 'hard look at the proffered evidence' in the NTT Report."[50]

NEPA "require[s] agencies to consider environmentally significant aspects of a proposed action."[51] "NEPA does not, however, require agencies to elevate environmental concerns over other appropriate considerations; it requires only that the agency take a 'hard look' at the environmental consequences before taking a major action."[52] "NEPA dictates the process by which federal agencies must examine environmental impacts, but does not impose substantive limits on agency conduct."[53] It merely guards against "uninformed—rather than unwise—agency action."[54] An agency must "take a 'hard look' at the environmental consequences of proposed actions utilizing public comment and the best available scientific information."[55] The hard-look standard ensures the "agency did a careful job at fact gathering and otherwise supporting its position."[56] To violate this standard, an agency must have "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or" its decision must be "so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[57] "Deficiencies in an EIS that are

---

[50] *Id.* at 19; *see id.* at 19-21.

[51] *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1162 (10th Cir. 2002).

[52] *Citizen's Comm. to Save Canyons v. Krueger*, 513 F.3d 1169, 1178 (10th Cir. 2008) (internal quotation marks omitted).

[53] *Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 821 (10th Cir. 2008).

[54] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).

[55] *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1171 (10th Cir. 1999); *see also Robertson*, 490 U.S. at 350.

[56] *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 704 (10th Cir. 2009) (internal quotation marks omitted).

[57] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

mere 'flyspecks' and do not defeat NEPA's goals of informed decision-making and informed public comment will not lead to reversal."[58]

WildEarth's position that the Forest Service should have considered the NTT Report is based on the NTT Report's statement that it "provides the latest science and best biological judgment" regarding national sage grouse conservation measures.[59] WildEarth has not identified any particular scientific study contained or cited in the NTT Report that would have been essential to the Forest Service's reasoned decision-making regarding the Project. Instead, WildEarth's position boils down to a disagreement over the scientific conclusions and mitigation measures in the ROD and NTT Report.[60]

Regardless of whether any discrepancy exists between the NTT Report's recommendations and the measures the ROD adopted, WildEarth has failed to show that the Forest Service's decision lacks evidentiary support or that its analysis was insufficient to meet the goal of informed and reasoned decision-making.[61] The record shows that the Forest Service collected and utilized the best available data—including a majority of the studies underlying the NTT Report—to analyze the potential impacts on sage grouse.[62] The Forest Service also asked the U.S. Fish and Wildlife Service ("FWS")—the resource agency tasked with determining the protections needed for sage grouse—to assist in designing appropriate mitigation measures.[63] The FWS conducted an extensive review of the scientific literature and determined that

---

[58] *New Mexico ex rel. Richardson*, 565 F.3d at 704.

[59] NTT Report, *supra* note 47, at FSAR 065520.

[60] *See Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1036 (10th Cir. 2001).

[61] *See id.*

[62] *See* Agencies' Opposition, *supra* note 2, at 27-29.

[63] *See* Telephone Conversation Record, FSAR 062118, dated Jan. 31, 2012.

Wyoming's core area approach had "excellent potential for meaningful conservation of sage-grouse."[64] The FWS recommended that the Forest Service consider the studies underlying Wyoming's approach in designing mitigation measures for the Project.[65] After doing so, the Forest Service ultimately adopted Wyoming's approach in the FEIS.[66]

Because the Forest Service considered the latest science and relevant available information in designing its core mitigation measures, including a majority of the studies underlying the NTT Report, the Forest Service took the requisite "hard look" at the Project's impacts. Based on the record, the Forest Service met its goal of informed decision-making as to appropriate mitigation measures for the Project. Failure to consider the NTT Report does not render the Agencies' actions arbitrary, capricious, or contrary to law.

   2.   *The Agencies considered and discussed a sufficient range of alternatives.*

"Under NEPA, an EIS prepared by a federal agency must include a discussion of 'alternatives to the proposed action.'"[67] "The agency must '[r]igorously explore and objectively evaluate all reasonable alternatives' for the proposed action in response to a 'specif[ied] underlying purpose and need.'"[68] "The range of reasonable alternatives 'is not infinite.'"[69] "Once an agency appropriately defines the objectives of an action, "NEPA does not require agencies to analyze 'the environmental consequences of alternatives it has in good faith rejected as too

---

[64] 75 Fed. Reg. 13910-01, at 13975 (Mar. 23, 2010).

[65] 2 FEIS, *supra* note 35, at FSAR 062002-062005.

[66] 1 FEIS, *supra* note 35, at FSAR 061457-061458.

[67] *Wyoming v. USDA*, 661 F.3d 1209, 1243 (10th Cir. 2011) (quoting 42 U.S.C. § 4332(2)(C)(iii)).

[68] *Biodiversity Conservation Alliance v. Jiron*, 762 F.3d 1036, 1083 (10th Cir. 2011) (quoting 42 U.S.C. § 4332(2)(C)(iii)).

[69] *Id.* (quoting *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1166 (10th Cir. 2002); *see also Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978) ("Common sense also teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man.").

remote, speculative, or . . . impractical or ineffective.'"[70] When reviewing "an EIS under the APA to determine whether an agency acted arbitrarily or capriciously by not considering certain alternatives, a 'rule of reason and practicality' informs the analysis."[71] The question that needs to be asked is "whether the agency selected and considered a range of alternatives 'sufficient to permit a reasoned choice among the options.'"[72] "The 'rule of reason' considers both the range of alternatives and the extent the agency discusses the selected alternatives."[73]

The FEIS identifies four alternatives the Agencies considered: one no-action alternative, and three action alternatives. "The three action alternatives vary in terms of timing of development, number and size of well pads, number of wells per pad, miles of new road construction needed to access the well pads and acres of surface disturbance."[74] "Applying the rule of reason to the question of whether this was a sufficiently broad/diverse range of alternatives for consideration, [courts] look first to the intended purpose of the proposed action."[75] The intended purpose of the action here was for Berry to "exercise [its] lease rights, and develop oil and gas resources within [its] existing federal oil and gas leases."[76] The record

---

[70] *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1030 (10th Cir. 2002) (quoting *All Indican Pueblo Council v. United States*, 975 F.2d 1437, 1444 (10th Cir. 1992)).

[71] *Biodiversity Conservation Alliance*, 762 F.3d at 1083 (quoting *Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 432 (10th Cir. 1996)).

[72] *Id.* (quoting *Wyoming*, 661 F.3d at 1243).

[73] *Id.* (quoting *Utahns for Better Transp.*, 305 F.3d at 1166); *see also Envtl. Def. Fund, Inc. v. Andrus*, 619 F.3d 1368, 1375 (10th Cir. 1980) ("The discussion of environmental effects of all alternatives need not be exhaustive, but it must be such that sufficient information is contained therein to permit a 'rule of reason' designation of alternatives beyond the primary proposal.").

[74] 1 FEIS, *supra* note 35, at FSAR 061285.

[75] *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1041 (10th Cir. 2001).

[76] 1 FEIS, *supra* note 35, at FSAR 061284.

shows that the Forest Service thoroughly evaluated each alternative and determined that the Selected Alternative was preferred because it would have the least impact on sage grouse.[77]

WildEarth's assertion that the Forest Service should have considered an alternative based on the NTT Report is misplaced. Wild Earth has failed to show that such an alternative would accomplish the intended purpose of the proposed action. The NTT Report simply offers guidance intended for the ongoing range-wide planning process for sage grouse. An agency has discretion to define the purpose and objectives of a proposed action and to determine the range of alternatives that must be considered.[78] A reviewing court only needs to determine whether the agency's range of alternatives is outside the rule of reason and practicality and whether the range of alternatives considered are sufficient to permit a reasoned choice among the options.[79]

Because the range of alternatives that the Forest Service considered were not outside the rule of reason and practicality, the failure to consider an alternative based on the NTT Report does not render the Agencies' action arbitrary, capricious, or contrary to law.

3.      *The Agencies were not required to supplement their NEPA analysis.*

WildEarth contends that the Agencies' approval of SUPOs and APDs without providing a supplemental NEPA analysis that conforms with the NTT Report is unlawful.[80] This is incorrect.

"An agency is required to prepare a supplemental . . . FEIS if . . . '[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.'"[81] "The duty to prepare a supplemental EIS is based on the need

---

[77] *Id.* at FSAR 061475.

[78] *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1244 (10th Cir. 2011).

[79] *Biodiversity Conservation Alliance v. Jiron*, 762 F.3d 1036, 1083 (10th Cir. 2014) (quoting *Wyoming*, 661 F.3d at 1243).

[80] AOB, *supra* note 2, at 24-26.

[81] *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1257 (10th Cir. 2011) (quoting 40 C.F.R. § 1502.9(c)(1)(i)-(ii)).

to facilitate informed decision-making."[82] A supplemental EIS is required only if the new information "is sufficient to show [the proposed action] will affect the quality of the human environment in a significant manner or to a significant extent not already considered."[83] But an agency does not need to supplement an EIS "every time new information comes to light."[84] "To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."[85] "Courts review an agency decision regarding the need for a supplemental EIS under the 'arbitrary and capricious' standard of the APA."[86] "The arbitrary and capricious standard of review is a 'narrow one,' which mandates considerable deference to agency decisions."[87]

For the reasons discussed in Part I. A.1 above, the record does not show that the NTT Report presents any significantly new information or study relevant to the Project or its impacts. As previously mentioned, the Forest Service discussed the latest science and findings in the FEIS, including a majority of the studies underlying the NTT Report. WildEarth has not identified any particular study cited in the NTT Report containing new information that "will affect the quality of the human environment in a significant manner or to a significant extent not already considered."[88] Because the environmental impacts of the Project have been fully

---

[82] *Id.*

[83] *Friends of Marolt Park v. U.S. Dep't of Transp.*, 382 F.3d 1088, 1096 (10th Cir. 2004) (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1989)).

[84] *Marsh*, 490 U.S. at 371.

[85] *Id.* at 373.

[86] *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1524 (10th Cir. 1992) (citing 5 U.S.C. § 706(2)(A)).

[87] *Id.* at 1527.

[88] *Marsh*, 490 U.S. at 374 (internal quotation marks omitted).

considered, any failure to supplement its NEPA analysis based on the NTT Report does not render the Agencies' actions arbitrary, capricious, or contrary to law.

### B.      The Agencies did not violate NFMA with respect to the NTT Report.

To the extent the ROD's mitigation measures are not consistent with the NTT's recommendations, WildEarth argues that the ROD is also inconsistent with the Forest Plan and, consequently, unlawful under the NFMA.[89] The Forest Plan sets forth several goals and objectives with corresponding standards and guidelines. One of its objectives is to "[m]anage the habitat of all . . . sensitive . . . species to maintain or enhance their status."[90] Among the guidelines associated with this objective is that "[r]esource management activities will be allowed if they will not adversely affect any . . . sensitive species."[91] It is this guideline with which WildEarth contends the ROD is inconsistent.

WildEarth's NFMA-violation argument is similar to its NEPA-violation argument discussed in Part I. A.1 above. Although WildEarth does not identify any particular "relevant data" or "relevant factors" contained or cited in the NTT Report that the Forest Service should have examined or considered when establishing mitigation measures for the Project. WildEarth simply disagrees with the conclusions that the Forest Service reached. Although "a party may cite studies that support a conclusion different from the one the Forest Service reached, it is not [the court's] role to weigh competing scientific analyses."[92] Courts "grant considerable discretion and deference to federal agencies on matters that require a high level of technical or scientific

---

[89] *See* AOB, *supra* note 2, at 21-24.

[90] Forest Plan, *supra* note 28, at FSAR 000856.

[91] *Id.* at FSAR 000856.

[92] *Forest Guardians v. U.S. Forest Serv.*, 641 F.3d 423, 442 (10th Cir. 2011) (quoting *Ecology Ctr. v. Catanesa*, 574 F.3d 652, 659 (10th Cir. 2009).

expertise."[93] To set aside the Forest Service's mitigation measures would require the court to decide that the conclusions and recommendations of the authors of the NTT Report have more merit than those of the Forest Service's experts. The court is not qualified to make this determination.

The court's review "is highly deferential."[94] "The duty of a court reviewing agency action under the 'arbitrary and capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made."[95] "In reviewing the agency's explanation, the reviewing court must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment."[96] The record shows that the Forest Service "examined the relevant data and articulated a rational connection between the facts found and the decision made." Any failure to consider the NTT Report does not render the Agencies' actions arbitrary, capricious, or contrary to law.

## II.   The Agencies adequately assessed the Project's impact on inventoried roadless areas.

WildEarth argues that the Agencies violated NEPA and the Roadless Area Conservation Rule ("Roadless Rule")[97] because they did not consider an alternative that would avoid the destruction of inventoried roadless areas ("IRAs") within the Leased Area.[98]

---

[93] *Id.*

[94] *Ecology Ctr. v. U.S. Forest Serv.*, 451 F.3d 1183, 1188 (10th Cir. 2006).

[95] *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994).

[96] *Id.*

[97] 36 C.F.R. § 294.10 et seq.

[98] AOB, *supra* note 2, at 26-35; *see* Amended Petition, *supra* note 2, ¶ 5.

A.      The Agencies did not violate NEPA with respect to IRAs.

As explained in Part I.A.2 above, NEPA requires an agency to "'rigorously explore and objectively evaluate all reasonable alternatives' for the proposed action in response to a 'specif[ied] underlying purpose and need.'"[99] But "[t]he range of reasonable alternatives 'is not infinite.'"[100] The relevant question is "whether the agency selected and considered a range of alternatives 'sufficient to permit a reasoned choice among the options.'"[101]

The intended purpose of the action here was for Berry to "exercise [its] lease rights, and develop oil and gas resources within [its] existing federal oil and gas leases."[102] Based on this stated purpose, the Forest Service considered a reasonable range of alternatives. One alternative that the Forest Service considered imposed no-surface-occupancy ("NSO") stipulations within IRAs.[103] The Forest Service ultimately eliminated this alternative from further analysis because it determined that

> [c]reating additional NSO stipulations, for IRAs within the Project Area, could potentially eliminate as many as 258 of the 374 proposed well pad locations, and eliminate road construction to those locations, thereby preventing needed and reasonable access to the minerals already leased within those areas." Preventing reasonable access in these areas would therefore prevent the lease holder from developing existing lease rights and would be contrary to the [MLA] and the purpose and need for the project.[104]

---

[99] *Biodiversity Conservation Alliance v. Jiron*, 762 F.3d 1036, 1083 (10th Cir. 2011) (quoting 42 U.S.C. § 4332(2)(C)(iii)).

[100] *Id.* (quoting *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1166 (10th Cir. 2002); *see also Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978) ("Common sense also teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man.").

[101] *Id.* (quoting *Wyoming*, 661 F.3d at 1243).

[102] 1 FEIS, *supra* note 35, at FSAR 061284; see ROD, *supra* note 31, at FSAR 062052.

[103] 1 FEIS, *supra* note 35, at FSAR 061338-39.

[104] *Id.* 61338-39.

The Forest Service met its burden in briefly discussing the reasons for eliminating this alternative from detailed analysis.[105] WildEarth, on the other hand, has the burden of showing a violation of NEPA. Based on the record and the Project's intended purpose, WildEarth has failed to satisfy this burden.

## B.   The Agencies did not violate the Roadless Rule.

The Forest Service promulgated the Roadless Rule in 2001.[106] Subject to limited exceptions, the Roadless Rule prohibits road construction, reconstruction, and timber harvest in roadless areas.[107] It has been challenged on multiple occasions, and enjoined on at least two occasions, in federal court. For example, two days before the Roadless Rule was to go into effect in May 2001, the U.S. District Court for the District of Idaho preliminarily enjoined its implementation.[108] Although that injunction was vacated in December 2002,[109] the U.S. District Court for the District of Wyoming permanently enjoined the Roadless Rule in July 2003.[110] While the District of Wyoming's decision was on appeal, the Forest Service adopted the so-called "State Petition Rule" in May 2005, "which superseded the Roadless Rule."[111] As a result, the Tenth Circuit "dismissed the appeal as moot, vacated the district court's … decision, and remanded the case to" be "dismiss[ed] without prejudice."[112] However, in October 2006, the Northern District of California set aside the State Petition Rule "and reinstated the Roadless

---

[105] *See* 40 C.F.R. § 1502.14(a).

[106] 66 Fed. Reg. 3244, 3247-48 (Jan. 12, 2001).

[107] *Id.* at 3272.

[108] *See Kootenai Tribe of Idaho v. Veneman*, No. 01-10, 2001 WL 1141275, at *2 (D. Idaho May 10, 2001).

[109] *See Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1126 (9th Cir. 2002).

[110] *See Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1226 (10th Cir. 2011); *Wyoming v. U.S. Dep't of Agric.*, 277 F. Supp. 2d 1197, 1239 (D. Wyo. 2003).

[111] *Wyoming*, 661 F.3d at 1226.

[112] *Id.* (citing *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1213 (10th Cir. 2005)).

Rule, despite the fact that the Wyoming district court had already found that the [Roadless Rule] violated federal law."[113] Following its reinstatement, the Roadless Rule was again challenged in the District of Wyoming, and in August 2008 that court again held the rule to be unlawful and issued a permanent nationwide injunction against it.[114] The Tenth Circuit overruled the District of Wyoming in October 2011, and the nationwide injunction was vacated on March 1, 2012.[115]

Against this procedural backdrop, two issues emerge: (1) whether the Forest Service was subject to the Roadless Rule when it approved the Project; and, if it was, (2) whether the Forest Service complied with the Roadless Rule. Answering the first issue in the negative renders the second issue moot.

As the above history reveals, the Roadless Rule was not in effect during most of the scoping, planning, and drafting of the EIS. In 2007, the Forest Service published a notice of intent to prepare an EIS and solicited public comments at the scoping stage.[116] In August 2008, the District of Wyoming's permanent nationwide injunction went into effect, and it was not vacated until March 2012—a month after the Forest Service issued its FEIS.[117] Consequently, the Roadless Rule did not apply to the February 2012 FEIS and ROD.

As an aside, WildEarth has argued that the Agencies were required to consider the Roadless Rule in connection with the approval of each SUPO.[118] As explained in the Draft re:

---

[113] *Id.* (citing *Calif. ex rel. Lockyer v. U.S. Dep't of Agric.*, 459 F. Supp. 2d 874 (N.D. Cal. 2006)).

[114] *Id.* (citing *Wyoming v. U.S. Dep't of Agric.*, 570 F. Supp. 2d 1309, 1355 (D. Wyo. 2008)).

[115] *Id.* at 1272; *Wyoming v. U.S. Dep't of Agric.*, No. 2:07-cv-00017-CAB, dkt. no. 201, filed Mar. 1, 2012.

[116] Notice, *supra* note 32, at FSAR 001925-26; Notice, *supra* note 33, at FSAR 001554-56.

[117] 1 FEIS, *supra* note 35; 2 FEIS, *supra* note 35.

[118] Reply, *supra* note 2, at 46; *see* Transcript, docket no. 108, at 20:6-13, filed Feb. 4, 2016.

Petitioner's Motion for Preliminary Injunction ("Draft"),[119] that issue is not properly before this court because WildEarth failed to exhaust its administrative remedies under 36 C.F.R. § 214.[120]

## III.    The Agencies adequately assessed the Project's impact on air quality.

WildEarth asserts that the Agencies violated NEPA, NFMA, and other standards related to the Project's impact on air quality.[121]

### A.    The Agencies did not violate NEPA with respect to air quality.

1.    *The Agencies properly supported and explained their decision regarding background concentration data.*

WildEarth argues that the Forest Service did not properly support or explain its decision to set the 24-hour block average for fine particulate matter ("$PM_{2.5}$") background concentration levels at a value of 27.6 $\mu g/m^3$.[122] Specifically, WildEarth contends that the "ENVIRON 2020" document cited as the source of the 27.6 $\mu g/m^3$ value was not properly made available,[123] and that the record does not provide any basis for this value.[124]

It is undisputed that in setting the background concentration for 24-hour average $PM_{2.5}$ to 27 $\mu g/m^3$, the Forest Service relied on UDA, the expert local agency on air quality matters.[125] It is also undisputed that Utah Division of Air Quality ("UDAQ") recommended using the $PM_{2.5}$

---

[119] Draft re: Petitioner's Motion for Preliminary Injunction, docket no. 138, filed July 22, 2019 ("Draft"). This Memorandum Decision is not based on the Draft. Rather, it is based on the law, the record, and the arguments of the parties. However, to the extent the Draft supports and is consistent with this Memorandum Decision, it is incorporated herein by reference.

[120] *See id.* at 45-57.

[121] Amended Petition, *supra* note 2, ¶ 5.

[122] AOB, *supra* note 2, at 38-40.

[123] *Id.* at 39.

[124] *Id.*

[125] *See* Appeal Responses, FSAR 064247, at 64271 (noting that UDAQ specifically recommended use of the $PM_{2.5}$ background value of 27.6 $\mu g/m^3$ for a 24-hour average 98% value); Personal Communication, FSAR 002606, dated Feb. 1, 2012 (regarding background information on NAAQS).

background value of 27.6 µg/m$^3$. Because the background concentration value was obtained from an expert local agency, it has a presumption of regularity.[126] Furthermore, as explained in the Draft, the record provides support for the 24-hour PM$_{2.5}$ background concentration, the documents referenced in ENVIRON2010 were reasonably available to the public, and other supporting information is also in the record.[127]

>    2.    *The Agencies took a "hard look" at the impact of secondary PM$_{2.5}$ formation.*

WildEarth argues that the Forest Service failed to take a "hard look" at project-related sources of secondary PM$_{2.5}$ formation.[128] However, as explained in the Draft, the science on this issue is disputed, and WildEarth has not cited to any law or practice to support its position.[129] As a result, WildEarth has failed to satisfy its burden of establishing that the action in question was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[130]

---

[126] *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006) ("[A]dministrative agencies generally are afforded a presumption of regularity."); *see, e.g.*, *Save the Peaks Coal. v. USFS*, No. CV 09-8163-PCT-MHM, 2010 WL 4961417, at *19 (D. Ariz.), *aff'd* 535 F.3d 1058, 1080 (9th Cir. 2012) (affirming USFS's reliance on state agency data); *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1169, n.8 (10th Cir. 1999) (rejecting contention that Forest Service must itself collect data or commission studies concurrent with its environmental assessment); *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772 (10th Cir. 2006) (affirming Forest Service and BLM's reliance on FWS findings in biological assessments in conducting NEPA analysis).

[127] Draft, *supra* note 119, at 48-52; *see* Kick-Off Materials, FSAR 001928, at FSAR 001934-35; Response to Comments, FSAR 002386, at FSAR 002386-94; ENVIRON, FSAR 002395, at FSAR 002398-99, dated Dec. 6, 2010; Personal Communication, *supra* note 125; Detailed Comments, FSAR 061031, at FSAR 061033, dated Apr. 26, 2010; 1 FEIS, *supra* note 35, at FSAR 061370, 61744-56, 61948-53; ENVIRON, FSAR 062119, at FSAR 062122-23; dated Dec. 6, 2010; Appeal Responses, *supra* note 125, 64271.

[128] AOB, *supra* note 2, at 41-42; Amended Petition, *supra* note 2, ¶¶ 196-198.

[129] *See* 2 FEIS, *supra* note 35, at FSAR 061745, 061768; *see also* Agencies' Opposition, *supra* note 2, at 51-52.

[130] *See* Draft, *supra* note 119, at 53-56.

3. *The Agencies took a "hard look" at the Project's impact on ozone concentrations.*

WildEarth asserts that the Forest Service failed to take a "hard look" at the impacts of the Project on ozone concentrations.[131] For the Forest Service to have violated this requirement, it must have "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[132] No such thing happened here. Rather, as explained in the Draft, the Forest Service has provided a reasonable explanation for its decision not to undertake a quantitative examination of the near-field impacts of the Project on ozone concentrations, and it developed a cumulative ozone analysis based on the best currently available, scientifically credible evidence.[133] WildEarth has failed to challenge the Forest Service's explanation. In the context of such technical and scientific matters, judicial deference to the Forest Service's decision must be exercised.[134] Accordingly, WildEarth has not satisfied its burden of demonstrating that the Forest Service's decision was arbitrary, capricious, or contrary to NEPA.

4. *The Agencies took a "hard look" at the impact of truck traffic and related activities.*

WildEarth contends that that the Agencies failed to take a "hard look" at the environmental impact of truck traffic and related activities.[135] But "NEPA requires no substantive

---

[131] AOB, *supra* note 2, at 48-51.

[132] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[133] Draft, *supra* note 119, at 57-59.

[134] *Utah Envtl. Cong. v. Bosworth*, 372 F.3d 1219, 1223 (10th Cir. 2004) (internal citations omitted).

[135] AOB, *supra* note 2, at 42-53.

result."[136] Rather, it "imposes procedural, information-gathering requirements on an agency, but is silent about the course of action the agency should take."[137] Thus, under NEPA, the Forest Service's obligation is to take a "hard look" at information relevant to its factual determination. Here, the record shows that the Forest Service reasonably considered the environmental impacts that truck traffic will cause. The record shows that the Forest Service took into consideration the relevant factors in determining that the 20-mile average roundtrip length was an appropriate measurement. The FEIS explains that "[e]missions associated with vehicle traffic were calculated using the average distance a vehicle would have to travel once they entered the production field."[138] This calculation was determined by "taking the shortest and longest road segments in the production modeling scenario and taking an arithmetic average of the two. This distance was then doubled to determine the round trip vehicle miles travel[led]."[139] The record reflects that Berry also provided truck trip estimates.[140] Although the Project road system consists of at least 77 miles, the Forest Service provides a reasonable basis for not using all 77 miles in its estimate—that is, not every mile of road will be traveled by every truck over the entire life of the Project. While WildEarth takes issue with this estimate and provides its own methodology for how to calculate truck trips, this does not render the Forest Service's reasoned evaluation of the available information and its own methodology arbitrary or capricious. "Courts are not in a position to decide the propriety of competing methodologies … but instead, should

---

[136] *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1166 (10th Cir. 2012).

[137] *Id.*

[138] 2 FEIS, *supra* note 35, at FSAR 061753.

[139] *Id.*

[140] *Id.* at FSAR 061835.

determine simply whether the challenged method had a rational basis and took into consideration the relevant factors."[141]

 As for limiting the analysis of truck travel to the Project area, the record reflects that the Forest Service analyzed in its far-field cumulative air analysis the emissions from vehicles traveling on paved and unpaved roads in the wider region.[142] Furthermore, truck traffic was included in the FEIS's dispersion modeling analysis.[143] Ultimately, "the 'determination of the extent and effect of [cumulative environmental impacts], and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies.'"[144] Based on the record and the arguments of the parties, WildEarth has not demonstrated that the Forest Service failed to consider the relevant factors or that its decision to limit its analysis of truck travel to the Project area was arbitrary or capricious. The record also reflects that the Forest Service appropriately considered potential impacts of fugitive dust from truck trips.[145] As to the remaining issues WildEarth has raised, WildEarth has—as explained in the Draft—failed to cite any law or practice to support its position or challenge the Forest Service's explanation.[146] WildEarth's post-hoc rationalization argument does not satisfy its

---

[141] *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 782 (10th Cir. 2006) (internal quotation and citation omitted).

[142] *See generally* 1 FEIS, *supra* note 35, at FSAR 061373, 061337-39, 061369.

[143] 2 FEIS, *supra* note 35, at FSAR 061751-53, 061821.

[144] *San Juan Citizens Alliance v. Stiles*, 654 F.3d 1038, 1057 (10th Cir. 2011) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976)).

[145] Regarding fugitive dust, *see, e.g.*, 1 FEIS, *supra* note 35, at FSAR 061361 (existing sources of air pollution); *id.* at FSAR 061574 (other impacts from transportation include fugitive dust); *id.* at FSAR 061327 (analysis of proposed alternative regarding fugitive dust); *id.* at FSAR 061582 (describing impacts from fugitive dust); *id.* at FSAR 061585 (same); 2 FEIS, *supra* note 35, at FSAR 061831-33 (construction fugitive dust assumptions); *id.* at FSAR 061842 (emissions data from road traffic installing production equipment); *id.* at FSAR 061846 (compressor station construction road traffic emissions data). USFS also disclosed the potential impacts from fugitive dust on other resources. *See, e.g.*, 1 FEIS, *supra* note 35, at FSAR 061446-47 (vegetation); *id.* at FSAR 061496 (elk habitat).

[146] *See* Draft, *supra* note 119, at 64-71.

burden of establishing that agency action was arbitrary, capricious, an abuse of discretion, or otherwise unlawful.

## IV.     The Agencies adequately assessed the Project's impact on water quality.

WildEarth's final contention is that the Agencies' approval of the Project failed to consider, prevent, and mitigate adverse impacts on water quality and to comply with Utah water quality standards.[147] However, as explained in the Draft, the record demonstrates that the Agencies took the requisite "hard look" at the Project's potential impacts on water quality, including the Utah Division of Water Quality's total maximum daily load ("TMDL") requirements and prescribed best management practices ("BMPs"), and ultimately imposed in the ROD several BMPs and mitigation measures.[148] Based on the record, WildEarth has failed to satisfy its burden of showing a violation of NEPA related to water-quality issues.

---

[147] Amended Petition, *supra* note 2, ¶ 5; *see* AOB, *supra* note 2, at 52-54.

[148] *See, e.g.*, Letter to West, FSAR 001591, at 001624-25, dated Mar. 1, 2006 (FEIS hydrology analysis); Appendix C, FSAR 002776, at FSAR 02799-825 (hydrology specialist's report); 1 FEIS, *supra* note 35, at FSAR 061418-22 (disclosure of water quality impairments designated by the Utah Division of Water Quality); *id.* at FSAR 061423-24 (disclosure of state-developed TMDL reports); *id.* at FSAR 061428-31 (surface water mitigation and BMPs); *id.* at 61430-32 (groundwater mitigation reflected in onshore orders); *id.* at FSAR 061431--32 (groundwater resources in the Project area); ROD, *supra* note 31, at FSAR 062075-79 (mitigation); *see* Transcript, *supra* note 118, at 73:10-11.

## ORDER

THEREFORE, IT IS HEREBY ORDERED that all relief requested in the Amended

Petition[149] is DENIED and this action is DISMISSED with prejudice.

The clerk is directed to close this case.

Signed February 5, 2021.

BY THE COURT:

David Nuffer
United States District Judge

---

[149] Docket no. 3, filed May 14, 2014.